UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X
UNITED STATES OF AMERICA,                          Cr. No. 14-00248 (PKC)

vs.

MICHAEL GRIMM,

                    Defendant.
----------------------------------------------------X

### SENTENCING MEMORANDUM ON BEHALF OF MICHAEL GRIMM

Respectfully submitted by:

Daniel Lawrence Rashbaum
Jeffrey A. Neiman
Michael A. Pineiro
**MARCUS NEIMAN & RASHBAUM**
2 South Biscayne Blvd.
Suite 1750
Miami, Florida 33131
(305) 400-4260

Stuart Kaplan
Joseph Sconzo
**KAPLAN SCONZO & PARKER, P. A.**
3399 PGA Boulevard, Suite 180
Palm Beach Gardens, Florida 33410
(561) 296-7900

*Attorneys for Defendant Michael Grimm*

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION………………………………………………………………1

II.   MICHAEL GRIMM'S BACKGROUND……………………………………6

    A.   Mr. Grimm's Childhood…………………………………………6
    B.   Mr. Grimm's Decorated Service as a U.S. Marine……………………8
    C.   Mr. Grimm's Service as a FBI Special Agent……………………9
    D.   Mr. Grimm's Service as a United States Representative…………………13
    E.   Mr. Grimm's Role as Caretaker and Caring Friend…………………16

III.  BACKGROUND FACTS RELATING TO OFFENSE CONDUCT………..........19

    A.   Mr. Grimm and His Partners Open Healthalicious……………………....19
    B.   Mr. Grimm Decides to Sell His Stake in Healthalicious…………………21

III.  THE ADVISORY SENTENCING GUIDELINES………………………22

    A.   The Presentence Investigation Report and Plea Agreement..………………...22
    B.   Mr. Grimm's Objections to PSR's Guidelines Calculation…………………23

IV.   THE SECTION 3553(A) FACTORS FAVOR A DOWNWARD VARIANCE…31

    A.   Nature and Circumstances of Mr. Grimm's Offense………………………33
    B.   Mr. Grimm's History and Characteristics………………………………36
        1.   Mr. Grimm's Military Service………………………………………...37
        2.   Mr. Grimm's Service to His Community and Care For Others……..38
        3.   Mr. Grimm's Role as Caretaker for His Mother and Sister………...41
    C.   Imposing a Sentence That is "Sufficient, But Not Greater
        Than Necessary"…………………………………………………43
    D.   The Need to Provide Restitution………………………………………45
    E.   The Need to Avoid Unwarranted Sentencing Disparity…………………46

V.    CONCLUSION……………………………………………………………54

i

## **TABLE OF AUTHORITIES**

### **CASES**

*Angamarca v. Orfaly*, No. 11-cv-07777-JGK (S.D.N.Y.) ........................................................ 26

*Gall v. United States*, 552 U.S. 38 (2007) ............................................................... 32, 36

*In re Ji Sung Yoo*, NY Industrial Board of Appeals, No. PR 11-174 (Feb. 27, 2014).................. 35

*In re Yick Wing Chan*, NY Industrial Board, No. PR 08-174 (Oct. 17, 2012) ............................ 36

*In re Young Lee Oh, NY Industrial Board of Appeals*, No. PR 11-017 (May 22, 2014) ............. 35

*In re Zi Qi Chan*, NY Industrial Board of Appeals, No. PR 10-060 (Mar. 20, 2013) ................ 36

*Kimbrough v. United States*, 552 U.S. 85 (2007) ............................................................... 31, 37

*Koon v. United States*, 518 U.S. 81 (1996)........................................................................ 32

*Perez v. Grimm, et al.*, Case No. 11-cv-8736 (S.D.N.Y.)........................................................ 27, 29

*Porter v. McCollum*, 558 U.S. 30 (2009) ............................................................................ 37, 38

*Reyes v. Orfaly*, No. 07-cv-00196-RJS (S.D.N.Y.) .............................................................. 26

*Rita v. United States*, 551 U.S. 338 (2007) .......................................................................... 31

*Rodriguez v. Orfaly*, No. 13-cv-00463-PGG (S.D.N.Y.)........................................................ 26

*Spears v. United States*, 555 U.S. 261 (2009).................................................................... 31

*United States v. Aaron*, 590 F. 3d 405 (5th Cir. 2009) ........................................................ 53

*United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006) ............................................ 2

*United States v. Booker*, 543 U.S. 220 (2005) ........................................................... 31, 40, 41

*United States v. Burton*, No. 11-cr-41 (E.D.N.Y.)................................................................ 50

*United States v. Calcagno*, No. 5-cr-298 (E.D.N.Y.) ............................................................ 50

*United States v. Campbell*, 765 F.3d 1291 (11th Cir. 2014) ................................................ 40

*United States v. Canova*, 412 F.3d 331 (2d Cir. 2005)................................................... 37, 40

*United States v. Carbajal-Vega*, No. 4-cr-349 (N.D.Ill) ...................................................... 53

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008)........................................................ 32

*United States v. Chivers*, No. 11-10430, 488 Fed.Appx. 782 (5th Cir. 2012)..................... 28, 29

*United States v. Cinquegrani*, No. 8 Cr. 848 (S.D.N.Y.)...................................................... 48

*United States v. Cishooga*, No. 14-cr-217 (E.D.N.Y.) ........................................................ 50

*United States v. Cole*, 765 F.3d 884 (8th Cir. 2014)........................................................... 45

*United States v. Collymore*, No. 13-cr-504 (E.D.N.Y.) ....................................................... 49

*United States v. Colp*, 249 F.Supp.2d 740 (E.D.Va.2003) .................................................. 42

*United States v. Cottingham*, 318 Fed.Appx. 159 (4th Cir. 2008)....................................... 41

*United States v. Frank,* No. 11-cr-820 (E.D.N.Y.). ............................................................. 47

*United States v. Gonzalez*, No. 7-cr-569 (E.D.N.Y.) .......................................................... 49

*United States v. Greenfield*, 44 F.3d 1141 (2d Cir. 1995) .................................................. 26

*United States v. Halbreich,* No. 14-cr-256 (E.D.N.Y.)........................................................ 48

*United States v. Howe*, 543 F.3d 128 (3d Cir. 2008) ......................................................... 37

*United States v. Kustrzyk*, No. 05-80216, 2007 WL 45929 (E.D.Mich. Jan.4, 2007) ................ 42

*United States v. Kwong*, No. 08-cr-547, 2009 WL 1617941 (E.D.N.Y. June 2, 2009) .............. 52

*United States v. Lanese*, 890 F.2d 1284 (2d Cir. 1989)...................................................... 24

*United States v. Mattarella*, No. 98-cr-309 (E.D.N.Y.)....................................................... 24

*United States v. McCormack*, No. 13-cr-597 (E.D.N.Y.)..................................................... 48

*United States v. Molina*, 356 F.3d 269 (2d Cir.2004) .................................................. 24

*United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) .................................... 41

*United States v. Napoletano*, No. 04-cr-156 (LAP) (S.D.N.Y.) ................................... 10

*United States v. Nellum*, 2005 WL 300073, No. 2:4-cr-30 (N.D.Ind. Feb. 3, 2005) ................... 37

*United States v. Olenicoff*, No. 7-cr-227 (C.D.Cal.) ........................................ 34, 53

*United States v. Paccione*, 202 F.3d 622 (2d Cir. 2000) .................................... 23, 24

*United States v. Park,* No. 12-cr-344 (E.D.N.Y.) ......................................... 47, 48

*United States v. Payne*, 63 F.3d 1200 (2d Cir.1995) ......................................... 25

*United States v. Quinn*, No. 10-cr-327 (E.D.N.Y.) ......................................... 49

*United States v. Rajaratnam*, No. 09 CR. 1184 RJH, 2012 WL 362031 (S.D.N.Y. Jan. 31, 2012)
........................................................................................................... 30

*United States v. Ramchandani*, No. 13-cr-324 (E.D.N.Y.) ................................... 49

*United States v. Roselli*, 366 F.3d 58 (1st Cir. 2004) ................................... 53, 54

*United States v. Schaadt*, No. 10-cr-57, 2015 WL 3466225 (N.D.Ind. June 1, 2015) .......... 41, 42

*United States v. Schuster*, No. 01 Cr. 67, 2002 WL 31098493 (S.D.N.Y. Sept. 19, 2002) ......... 45

*United States v. Serafini*, 233 F.3d 758 (3d Cir. 2000) ................................... 39, 40

*United States v. Shamilzadeh*, No. 04-cr-1094 (JG) (E.D.N.Y.) ................................ 6

*United States v. Shin*, No. 12-cr-182 (E.D.N.Y.) ......................................... 50

*United States v. Shockler* No. 12-cr-415, 2013 WL 4851695 (E.D.N.Y. Sept. 10, 2013) ...... 45, 46

*United States v. Sime* No. 11-cr-295 (E.D.N.Y.) ......................................... 47

*United States v. Singh*, No 13-cr-408 (E.D.N.Y.) ......................................... 51

*United States v. Stoerr*, 695 F.3d 271 (3d Cir. 2012) ...................................... 53

*United States v. Suarez-Reyes*, No. 8:12CR67, 2012 WL 6597814 (D. Neb. Dec. 18, 2012) ...... 54

*United States v. Thurston*, 544 F.3d 22 (1st Cir. 2008) ..................................... 41

*United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009) ................................... 40, 53

*United States v. Torres*, No. 4-cr-352 (E.D.N.Y.) ......................................... 52

*United States v. Urena*, 425 Fed.Appx. 6 (2d Cir. 2011) ................................... 32

*United States v. Verkhoglyad*, 516 F.3d 122 (2d Cir.2008) ................................ 32

*United States v. Warner*, No. 13-cr-731 (N.D.Ill.) ................................. 44, 45, 52

*United States v. Weisberg*, 297 Fed.Appx. 513 (6th Cir. 2008) ............................. 41

*United States v. Zagari*, 111 F.3d 238 (2d Cir. 1997) ............................ 27, 28, 30

## STATUTES

18 U.S.C § 3553 .................................................................................. passim

26 U.SC. § 7206 .................................................................................. passim

29 U.S.C. § 201 ...................................................................................... 29

## UNITED STATES SENTENCING GUIDELINES

§ 2T1.4 ............................................................................................. 22

§ 3B1.1 ................................................................. 22, 23, 24, 25, 26, 27

§ 3C1.1 ............................................................................................. passim

§ 3E1.1 ............................................................................................. 22

§ 5H1.1 ............................................................................................. 37

## OTHER AUTHORITIES

Jacqueline Bell, Florida, *Florida NY Top List of Busiest Courts for FLSA Suits*, LAW 360 (May 2, 2015)............................................................................................................................34

Sachin S. Pandya, *Tax Liability for Wage Theft,* 3 COLUM. J. TAX. L. 115 (2012)...................... 35

Sentencing Guidelines, App. C, Vol. III (Nov. 1, 2011) ............................................. 37

U.S. Sentencing Commission, AMENDMENTS TO SENTENCING GUIDELINES (April 2015)........... 34

U.S. Sentencing Commission, FY 2013 CHAPTER THREE ADJUSTMENT REPORT........................ 35

United States Governmental Accountability Office, *Fair Labor Standards Act: The Department of Labor Should Adopt a More Systematic Approach to Developing Its Guidance*, Dec. 2013, at 13 ...................................................................................................................... 34

*US Judge Sentences Ex-Tax Lawyer to Probation*, REUTERS, March 30, 2010. ......................... 48

William K. Rashbaum, *Rep. Michael Grimm Is Said to Agree to Tax Fraud Guilty Plea*, NEW YORK TIMES, Dec. 22, 2014, at A21. ......................................................................... 44

Michael Grimm, through his counsel, respectfully submits this sentencing memorandum in connection with his sentencing on July 2, 2015. Upon consideration of the factors set forth in 18 U.S.C. § 3553(a) and for the reasons stated below, a sentence of probation is the proper and just sentence for Mr. Grimm.

## I.  <u>INTRODUCTION</u>

Mr. Grimm pled guilty to one count of violating 26 U.S.C. § 7206(2), in connection with his role as part owner of a small, quick serve restaurant ("QSR") in Manhattan (before he ever ran for public office or became a member of the U.S. House of Representatives). Naturally, because of his station as an elected official, from which he has voluntarily resigned, this case has been followed closely by the media: Mr. Grimm's guilty plea was national news, and he has been depicted as a caricature of the typical politician who gets in trouble with the law. But that characterization could not be further from the truth. As this memorandum demonstrates, Michael Grimm's offense is an aberration in an otherwise remarkable life lived in selfless service of this country and dedicated towards helping his family, friends, and community.

Putting aside any preconceived notions of Mr. Grimm and looking closely at the sentencing factors under 18 U.S.C. § 3553(a), a downward variance to a non-custodial sentence is the only appropriate sentence on these facts for a variety of reasons.

*First*, Mr. Grimm's life has been exceptional in its selfless devotion to this country and in his acts of compassion and generosity towards others. Explaining the importance of a defendant's history and characteristics as a sentencing consideration, Judge Rakoff wrote:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what

> Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'

*See United States v. Adelson*, 441 F.Supp.2d 506, 513-514 (S.D.N.Y. 2006).  With regards to Michael Grimm, there is much good to account for and much to be credited.  From the early age of eleven, when he started his first job stocking shelves and delivering groceries on foot, Michael had an incredible work ethic and recognized the need to help support his family and his community.  While Michael worked many odd jobs throughout his teenage years, including working full-time during his senior year of high school, he still found the time to volunteer to help special needs children and other charitable causes.  Most significantly, when he was still a teenager, Michael gave up a college scholarship to volunteer to serve this country as a U.S. Marine, and was eventually deployed to serve in the First Gulf War.  During the war, he volunteered for combat operations when his unit was designated for a non-combat post, survived an explosion of a Humvee while driving through enemy minefields, and earned a rare promotion for his bravery and valor in combat.

Moreover, Michael's devotion to our country and community is far from limited to his impressive service in the Marine Corps.  Even after attaining his degree from Baruch College and a law degree from New York Law School, Michael passed on the financial benefits of the private sector and continued to dedicate his life to the public good as a FBI Special Agent.  In the FBI, he worked tirelessly as a deep undercover agent for over five years in addition to the more than five years that he was assigned as a case agent.  Then, after a brief stint as a small business owner, which led to this aberrant offense conduct, he returned to his passion of serving his country and community as the Representative of New York's 11th Congressional District.  Simply put, as evidenced by the thirty-five letters submitted to this Court supporting him, Michael has fundamentally impacted countless lives—those of his family, friends, former constituents, and

others—through acts of selflessness, generosity, and compassion.  He has always placed this country and others before himself.  As stated by Judge Rakoff, all of this—the extraordinary life Michael has led, the debt of gratitude this country owes him—must come to bear now.

*Second*, Mr. Grimm is tremendously remorseful over his offense.  He understands that his tax violation is not something to be taken lightly, and he is anguished over his wrongdoing and will live with the shame of it for the rest of his life.  Indeed, always his own toughest critic, Mr. Grimm has voluntarily given up his passion of serving the people of Staten Island and Brooklyn, which for him was not a job but rather a calling and something he loved, in an effort to make recompense for his wrongdoing.  However, we respectfully submit that on the spectrum of possible tax offenses, the offense conduct was neither severe nor indicative of a significant degree of culpability when compared to an overwhelming majority of reported similar cases

A novice entrepreneur of modest means, Mr. Grimm opened Healthalicious, the restaurant to which his offense conduct is related, with two partners, one of which was a well-established restauranteur.  As discussed below, Mr. Grimm's offense conduct was almost exclusively based on his partaking in the administrative and payroll practices that were implemented by this partner.  While it is no excuse for his criminal conduct, Mr. Grimm did not initiate these practices, and engaged in them to keep a struggling business afloat, not due to avarice or greed.  Indeed, over the entire time period of his offense, Mr. Grimm avoided only approximately US $31,000 in personal taxes, which includes taxes owed for over fourteen months (from mid-2009 through mid-2010) when Mr. Grimm no longer held an ownership interest in the restaurant.  Ultimately, Mr. Grimm extricated himself from the restaurant and offense conduct on his own accord many years before any inquiries or investigations by the Government.  Indeed, the restaurant was never even audited by the IRS or the New York State Department of Taxation when Mr. Grimm was an owner.

3

Moreover, although Mr. Grimm accepts full responsibility and is extremely sorry for his conduct, it should be noted that his offense conduct (hiring workers "off-the-books" and under-reporting business income) is virtually always addressed through civil fines imposed by civil regulatory authorities, and not through criminal prosecution.  In fact, there are hundreds of civil proceedings brought every year by both the New York State Department of Taxation and the Department of Labor or by private plaintiffs (pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*) regarding cash payments and underpayment of employee wages by restaurant owners in New York, but we have not identified a single reported criminal tax case brought in this District against a New York restaurant owner in at least over a decade.

*Third*, Mr. Grimm already has been harshly punished for this tax offense.  He resigned his seat as a U.S. Congressman; has been suspended by the New York State and Connecticut Bar Associations and may be disbarred by both bars pending the outcome of this case; has forfeited a significant Congressional pension that would have vested at the end of 2015; is now in severe debt; and has been publicly humiliated and shamed in the media and across the country.  As a convicted felon and with the stigma of his well-publicized conviction forever following him, his prospects of meaningful future employment have been severely diminished.  Thus, at 45 years old, he has lost everything that he worked so hard to achieve:  his office, his career, his pension, his good name, the respect and esteem of the public at large, and likely his license to practice law.  In short, Michael Grimm's life has been irreparably and fundamentally damaged as a result of his conduct and will never be the same.  Additionally, the past seven months while waiting to be sentenced, Mr. Grimm has tirelessly attempted to maintain short-term consulting jobs to make ends meet, but has been completely stymied in his efforts to obtain a meaningful, full-time job because of the uncertainty of his sentence.  Under these circumstances, where so much has already been lost, the

4

aims of sentencing—specifically, deterrence and promoting respect for the law—are accomplished with a non-custodial sentence.

*Fourth*, sentencing Mr. Grimm to a custodial sentence would effectively place his mother and sister, for whom Mr. Grimm is the sole caretaker and source of financial support, in a desperate situation. As detailed below, Mr. Grimm's mother suffers from severe diabetes and emphysema, and his dependent sister suffers from a debilitating depression that has left her unable to work for many years. They both live in Mr. Grimm's home, and intensely rely upon his care and financial support. Most significantly, Mr. Grimm is the only person who can care for his mother; ensure that she monitors her blood levels and takes her insulin injections; and drive her to her doctor's appointments. A custodial sentence for Mr. Grimm would be a substantial hardship for her.

*Fifth*, and importantly, a sentence of probation is appropriate here because anything more severe would be disproportionate to sentences imposed in this District and in other jurisdictions around the country for defendants convicted of similar or worse offenses, with less upstanding personal backgrounds. In this memorandum we have identified a long list of sentencing decisions in this District and the Southern District of New York supporting the imposition of a non-custodial sentence for Mr. Grimm. Mr. Grimm should not be treated different than other similarly situated defendants—or receive a different outcome—merely because this case is in the news. Indeed, given his background, especially his service to this country, the Court should be more lenient with Mr. Grimm than it would otherwise be with other defendants in similar cases.

In sum, we submit that the circumstances here warrant a non-custodial sentence. As Judge Gleason stated, "Alternatives to incarceration exist that can carry both the community and [a] Court's condemnation of . . . conduct but channel it in a way that's more constructive, given [] significant charitable works and contributions before th[e] case . . . ." *See* Sentencing Tr., *United*

*States v. Shamilzadeh*, Case No. 04-cr-1094 (JG) (E.D.N.Y.).  Here, on these facts, and as with other similar defendants facing sentencing proceedings in this District for similar offenses, a non-custodial alternative is what is appropriate and just; it is what satisfies the statutory mandate that Mr. Grimm's sentence be "sufficient, but not greater than necessary," to accomplish the purposes of sentencing.  *See* 18 U.S.C. § 3553(a).

## II.   MICHAEL GRIMM'S BACKGROUND

### A.   Mr. Grimm's Childhood

Michael Grimm was born on February 7, 1970, in Brooklyn, New York, the second of two children to Gerard and Petrina Grimm.  Michael and his older sister, Deborah Grimm, were raised in Queens, New York.  Michael's family was a lower-income family; his father worked primarily as a roofer but held various jobs to make ends meet, and his mother was a homemaker.   Deborah Grimm described their humble upbringing:

> We were not entitled or privileged children. . . .We were the working class poor that is talked about today, but was completely anonymous 30 years ago.  Our parents married when they were both teenagers and our father had little education, being forced to quit school to help support his family.  Dad . . . was a roofer who earned barely enough money to keep food on the table, working 2, often 3 jobs . . . [Our family] struggled to make ends meet. . . . We didn't have expensive furniture or clothing, or go on family vacations, or have fancy birthday parties; any money they had they used to purchase a home, which still had a mortgage upon our father's death in 2008.  Our home was repaired and maintained by our father, and as soon as my brother could fit a hammer in his hand, Michael worked to keep up the house.

(Ltr. From D. Grimm, Exhibit A).

Michael Grimm's parents were married for 44 years until his father passed away in 2008 from lung cancer.  Their marriage was difficult and at times tumultuous because Michael's father was an alcoholic who frequently became verbally abusive and threatening when he was intoxicated.  On the occasions where his father would drink too much, it was Michael who, even as a child, assumed the role of protector of his mother and sister.  *See* PSR ¶ 39.

Even at a young age, Mr. Grimm was a hard-working and giving person. Since the age of eleven, Michael worked part-time jobs after school, and he continued working throughout high school. He worked at the local deli, fast food restaurants, local supermarket, and with his father doing roofing and laborer's work on the weekends, among other places, *see* PSR ¶ 56, all the while excelling in school and sports. (D. Grimm Ltr, Ex. A). In addition, in a theme that pervades every stage of Michael Grimm's life through the present day, as a child and teenager he had a notable sense of compassion and commitment to community service. In high school, Mr. Grimm volunteered much of his free time to help those in need. His mother recalls:

> At 14 years old Michael started volunteering in the summer for a camp that helped take care of children with Downs Syndrome and continued every year that he was in high school. The thing I always found odd for a boy his age was that my son never needed to be asked to help but rather sought out ways to do so. As a freshman Michael volunteered to be a counselor for his classmates [who] had alcoholic and abusive parents. I found out about this many years later at an award ceremony [where] he received a huge honor for his character and integrity. I [also] learned that the religious Brother who ran the program chose Michael to work with a student [who] spoke of committing suicide and that he would stay after school regularly to counsel him and simply be a sounding board and shoulder to cry on.

 (Ltr. from P. Grimm, Exhibit A).

Mr. Grimm's lifelong friend, Rich Bonura, who says his 37 year friendship with Mr. Grimm was "born out of a common link of alcoholic fathers," submitted a letter discussing Mr. Grimm's concern for his well-being when they were children:

> We both from a very young age worried as the night dragged on what kind of conditions our fathers would come home in, and what kind of physical or verbal assault was to follow. Michael was the protector in our friendship and the positive male role model for me growing up even though he was only a year older than I. I was always looking for trouble and had it not been for Michael I would have found it many more times. I really didn't have anyone to direct me other than Michael as my mother had her own dependency issues. . . . Michael as the protector and mentor helped me to understand we weren't condemned to live our fathers' lives. As a role model Michael never drank and encouraged me to follow his lead. For as long as I can remember Michael was focused on public service and helping people. He lived every day with that in mind. He was my voice of reason and often my conscious. .

. . Michael always looked out for me and stuck up for me when others bullied me, and I will never forget that because it was those times I remember I wasn't alone.

(Ltr. from R. Bonura, Exhibit A).

Similarly, in her letter, Maria Ciccia tells how Michael assisted a mutual childhood friend of theirs who was stricken with cancer. She says that Michael was "devoted" to helping his sick friend: he would "bring his ill friend to school when he had trouble walking, . . .ma[de] sure he had a good time despite rigorous cancer treatments, . . . and encouraged him to go to the prom." (Ltr. from Maria Ciccia, Exhibit A).

It was this compassion for others and selflessness that led Michael into a career of military and public service.

### B.      Mr. Grimm's Decorated Service as a U.S. Marine

Mr. Grimm wanted to enlist in the United States Marine Corps when he was just seventeen years old, the earliest one can enlist, and before he graduated high school. His mother recounts that Michael believed "our freedom wasn't free and that he owed a debt to all those who served and he felt it was his turn to serve his country." (P. Grimm Ltr., Ex. A). However, following his mother's wish that he continue his education, Michael graduated high school and enrolled in Baruch College, where he received a scholarship. In 1989, after completing his freshman year, Michael gave up his scholarship and enlisted in the Marines. *See id.*; PSR ¶ 56.

In 1990, while on active duty, Michael was deployed to Kuwait for the First Gulf War. While his unit was not designated for combat in Operation Desert Storm and was assigned to a non-combat, rear position that would provide support for the troops on the front lines, Michael was the first in his unit to volunteer for combat, putting his life at grave risk in missions where he encountered minefields and gunfire and where severe casualties were expected. *See* (Ltr. from G. Molinari, Exhibit A); *see* also Exhibit B (M. Grimm Military Paperwork); PSR ¶ 56. In fact, in a

briefing in advance of one such mission, Michael's combat unit was informed that they were expecting 50% casualties.  (G. Molinari Ltr., Ex. A).  On another occasion, Michael's Humvee exploded after hitting an anti-tank mine on the first day of the initial ground offensive by U.S. and Coalition forces.  *See* Ex. B.  According to his commanding officer who recommended him for his combat promotion, the day after the explosion, despite having just suffered through that traumatic episode, when asked if he had any reservation about going on a dangerous mission through an opening in the enemy's line of defense, Michael "stated very strongly [he] wanted to go back." *See* Ex. B.  Even after several near-death experiences, Michael also volunteered to lead enemy prisoners of war, captured by Michael and his follow Marines, by foot through enemy minefields in the black of night, to bring them to safety along the Saudi Arabian border.  *See id*.

For the valor he demonstrated in Operation Desert Storm, Michael received a Combat Meritorious Promotion (and was promoted to a Non Commissioned Officer), which is a rare distinction for a Marine.  *See* Ex. B; *see* PSR ¶ 56.  The request for this distinction, submitted by his commanding officer, stated that Michael was one of the "finest Marines a man could ask for." *See* Ex. B.

Michael ended up serving two tours in Kuwait, and was in the reserves from 1993 through 1997, when he was honorably discharged.

### C.    Mr. Grimm's Service as a FBI Special Agent

 Upon returning from Kuwait, and while on active reserve, Mr. Grimm completed his education.  From 1991 to 1994, he went to class during the day at Baruch College and attained his B.B.A., while at night he worked as a clerk for the Federal Bureau of Investigation.  In 1992, Mr. Grimm also completed the Federal Police Officer Training Program, was deputized as a U.S. Marshall, and served as a uniformed police officer for the FBI.  After working in the financial

sector from 1993 through 1995, Mr. Grimm returned to the FBI as a Special Agent in the New York Field Office. He held that position until 2006. Additionally, in 1998, while serving as an FBI agent, Mr. Grimm put himself through law school by taking night classes, and in 2002 graduated *magna cum laude* and ninth in his class.

In his eleven year career as a FBI Special Agent, Mr. Grimm again served with distinction, demonstrating bravery and tremendous loyalty to his fellow agents. Initially, Mr. Grimm worked in the Organized Crime Branch, which investigated the Gambino Crime Family of La Cosa Nostra, before he was assigned to a financial fraud squad investigating white collar crime on Wall Street and elsewhere. In 2001, like most agents in the New York Office, he worked on the pile at the World Trade Center site after the September 11 terrorist attack. Subsequently, from 2002 to 2006, Mr. Grimm worked almost exclusively as an undercover agent. While undercover, he was involved in major investigations that resulted in numerous high-level indictments and convictions. For instance, Mr. Grimm went deep undercover for almost two years as a corrupt foreign currency trader and money launderer in "Operation Wooden Nickel," a long-term, deep undercover investigation into fraudulent trading practices and money laundering at various Wall Street firms, including J.P. Morgan and UBS AG. Mr. Grimm's efforts in that investigation resulted in convictions against dozens of currency traders and other defendants. *See United States v. Napoletano*, No. 04-cr-156 (LAP) (S.D.N.Y.). Mr. Grimm also went undercover in investigations into political and law enforcement corruption in New Jersey, Florida, and elsewhere.

Michael's former colleagues at the FBI describe him as someone who they could depend on and trust with their lives. One of his former colleagues was FBI Special Agent Joaquin Garcia, who worked undercover with Michael. Special Agent Garcia is one of the most prolific, well-known undercover agents in the history of the FBI. He is best known for his undercover role as

"Jack Falcone," in which he infiltrated the Gambino crime family of La Costa Nostra in New York City which resulted in the conviction of over 30 members of the mafia. *See* Joaquin Garcia and Michael Levin, *Making Jack Falcone* (2009). Mr. Garcia describes Mr. Grimm as follows:

> Michael is a very rare breed, someone that cares more about others than he does himself. He would give someone the shirt off his back or the last nickel in his pocket if he thought that person needed it more than he did. . . .I put my life in Michael's hands several times and I'd feel comfortable doing it again. He is truly fearless and would give his life for his fellow agent if he had to, of that I am certain. When I was infiltrating the Gambino crime family, I reached a point where I felt like I needed help and someone that I could fully rely on. Michael Grimm was the only agent I would trust to have my back in that case and that was because I knew if push came to shove, he would not hesitate to risk his life to ensure my safety.

(Ltr. from J. Garcia, Exhibit A).

Indeed, Michael put his commitment to his fellow FBI Agents above his own career interests at the Bureau. Perhaps the best example of this is illustrated by his unwavering support of FBI employee Robert Kobus, a FBI whistleblower who brought to light time and attendance fraud in the FBI New York Field Office. *See* Jerry Seper, *Grassley: Whistleblower Cases Stuck 'In Limbo' Under Holder*, THE WASHINGTON TIMES, November 15, 2011. For reporting this misconduct, Mr. Kobus became a "pariah" within the New York Field Office, and ended up bringing a whistleblower retaliation case against some of his supervisors. The investigation of his case languished for nine years, until recently when the Office of the Inspector General found that Mr. Kobus had in fact been subject to improper retaliation. Throughout the ordeal, Michael was steadfast in his unabashed support of Mr. Kobus—even if it meant incurring the enmity of his supervisors and his colleagues at the Bureau. Mr. Kobus recalls:

> [W]hen I reported wrongdoing within the FBI, Mike was one of only two FBI Agents that supported me and did not treat me as a "pariah." He would regularly visit me on the deserted floor where I was assigned (among 130 empty desks) at great risk to his career. Mike always believed in me and helped me any way he could for the nine years that my case dragged on. After enduring severe retaliation for being a whistleblower, I began to doubt my decision to report the wrongdoing;

11

it was Mike that I relied on to lift my spirits and give me the confidence I needed
to get through each difficult day.  After nine long years and finally being vindicated,
I thank God that I had a friend like Mike to carry me through this horrible situation.

(Ltr. from R. Kobus, Exhibit A).

Perhaps even more telling as to Michael Grimm's true character, as a FBI Special Agent
his compassion and concern was not limited to just his colleagues at the Bureau.  For example, he
showed rare empathy for Patrick Sweeney, the <u>target</u> of one of his undercover investigations.  Mr.
Grimm investigated and arrested Mr. Sweeney in connection with Operation Wooden Nickel.  At
the time, Mr. Sweeney describes his life as "spiraling out of control" with "a terrible gambling
problem that led him down the path of illegal trading and drugs."  (Ltr. from P. Sweeney, Exhibit
A).  Ironically, Mr. Sweeney credits Michael Grimm with saving his life.  He states:

> [Michael] was very different from other FBI Agents in many ways, but the most
> significant thing that sticks out in my head is how he treated me. . . . Even when I
> was in custody . . . Mr. Grimm treated me with the utmost respect and allowed me
> to keep what was left of my dignity.  He took the time to actually talk to me and
> said he saw something in me that told him I was a good person deep down and just
> got caught up in a bad scenario.  He was right.  Mr. Grimm then went to bat for me
> with the U.S. Attorney and asked them to give me an opportunity to work with him
> so that I could avoid jail time.  I spent many months with Mr. Grimm and he spent
> a lot of time counseling me, motivating me and inspiring me to remember who I
> really was and to believe in myself.  I am the successful person that I am today
> because Mr. Grimm gave a damn about me when I didn't deserve it.
> …
> Looking back at all the time we spent together I find it hard to believe that he put
> so much faith in me and invested so much in a person that he arrested. . . . [I] really
> feel like he was sent by God to turn my life around.  I remember him telling me that
> all good people deserve a second chance and that we use our mistakes to learn and
> become stronger, better people.  He was right.

*See id*.  Significantly, in his letter, Mr. Sweeney credits Mr. Grimm, of all people, with allowing
him to be a good husband and loving father to Mr. Sweeney's three children.  *See id*.

### D.     Mr. Grimm's Service as a United States Representative

From January 2011 to early January 2015, Mr. Grimm served as a United States Representative for New York's Eleventh Congressional District.  Mr. Grimm's strong support in his district stemmed in large part from his commitment to his constituents, which is well-documented in the various letters of support submitted by residents of his District.  *See* Ex. A.  All of these letters are a testament to Mr. Grimm's dedication to public service and his constituents, but a few are particularly poignant in describing a devotion to those in need that went far beyond the typical "constituent services," where his close personal involvement was clearly borne of compassion and empathy, not political expediency.

For instance, Michael Hill, a veteran, who Mr. Grimm assisted when he was in office, says "[b]ecause of Mr. Grimm's care, concern, compassion, and consideration, I now live as a human being, as opposed to a homeless outcast." (Ltr. from M. Hill, Exhibit A).  Mr. Grimm assisted Mr. Hill in obtaining veteran's disability benefits that he had been denied since first applying in 1989.  *See id.*  According to Mr. Hill, Mr. Grimm changed his life:

> Perhaps it isn't easy for people to understand what it truly means to feel utterly alone.  I fought for my country and I felt like my country turned its back on me.  Michael changed this for me.  It isn't just that he helped me, it is that he was so genuine in his concern, so dedicated to standing by me.  He approached me as my Congressman but quickly became my friend and brother of service.
> …
> He called to check up on me and my progress and this he did privately, not for votes or recognition but because he knew in his kind heart that I hurt and needed help.  It is a hard thing to need to help, to be powerless in helping yourself. It is a hard thing to feel so beaten down.  How could I give up when he wouldn't give up on me?

*See id.*  By giving his support, Mr. Hill says Michael "was an instrumental force in giving me my life back, as well as my dignity and self-respect and I believe him to be a Godsend."  *See id.*

Similarly, Katherine Khatan, a community activist who helps the Yemeni community in New York, said that Mr. Grimm was one of the most caring and respectful politicians she has ever

met, and that "[h]e truly served with his heart and made everyone feel important."  (Ltr. from K.

Khatan, Exhibit A).  Ms. Khatan cites to a couple of examples of the "miracle work that Michael

did for [the Yemeni] community and how his tireless efforts actually changed families lives

forever."  *See id*.  In one instance, Ms. Khatan asked Mr. Grimm for assistance in bringing home

a young woman who was a U.S. citizen who was being held captive in Yemen.  The young woman

had traveled to Yemen to meet her new husband's family, but the husband became abusive, was

starving her, and refused to sign off on her exit visa, which she needed to leave Yemen.  *See id*.

The young woman's father sought assistance from State Department officials and other elected

officials, all of whom said they could not help in this situation because Yemeni law applied and

could not be changed.  Then, according to Ms. Khatan, "I brought [the father] to Michael Grimm

and the miracle began."  *See id*.  Ms. Khatan describes Mr. Grimm's assistance in the matter:

> Unlike other politicians, Michael personally handled the matter and called every
> official he could in both countries.   He opened his office at midnight to make and
> receive calls because of the time difference.  He was preparing a trip to go and bring
> her home himself, which led the Yemeni government to put pressure on the family
> to let her leave the country and she finally returned to her father in Brooklyn where
> she was born.  The doctors said another week in captivity and she would have likely
> died.   I firmly believe that if Michael wasn't such an aggressive and strong
> advocate, she would have died and this man would have lost his daughter.

*See id.*

Finally, Mr. Grimm's constituents are effusive in praising his efforts to assist and support

them during and after Hurricane Sandy.  Daniela Columbo, a victim of Hurricane Sandy, writes

that Mr. Grimm had a "profound personal impact" on her family's life.  (Ltr. from D. Columbo,

Exhibit A).  Mrs. Columbo describes Mr. Grimm's support:

> We are among those who still haven't recovered fully and we are still worried about
> the next storm.  Fortunately, Michael Grimm is one of the few people who has been
> with us – and has been fighting for us – the whole time.  We live in a flood prone
> area next to a creek and are hoping that our property can be bought by the
> government and returned to nature.  So far as I can tell, Michael has been the driving

14

force in giving my neighborhood hope that this could actually happen.  Again, I cannot begin to tell you how much he has helped us and given us hope in our lowest moments.  During those times when we felt that we were being forgotten, Michael was the one who kept us going.  His compassion and sincerity allowed my husband and I to maintain our pride and feel like we were not begging.

The fact that a Congressman was personally there for us when we were in danger and never forgot about us in the months and years after is something I will never forget.  I know that my neighbors and many others in areas hit by Sandy feel the same way.

*See id.*

There is also the story of Patricia Dresch, whose family suffered a terrible tragedy in Hurricane Sandy.  Ms. Dresch lost her husband, daughter, and her home in the storm.  According to Ms. Dresch, the very next day after the storm Mr. Grimm was one of the first faces she saw at her hospital bed "ready to support me," and "his assistance went beyond anything expected from a politician."  (Ltr. from P. Dresch, Exhibit A).  Ms. Dresch describes how Michael constantly makes sure that she had food, shelter, and transportation to her doctor's appointments.  *See id.*  Because she could not bear to visit the site where her house used to stand, Michael ensured that she always was represented when a government agency would visit the site to assess the property damage.  *See id.*  When the flag that was placed over her veteran father's casket could not be found during the hurricane recovery efforts, Mr. Grimm had a flag flown over the U.S. Capitol in his name and presented it to Ms. Dresch as a way to honor her father's memory.  *See id.*  And finally, to ensure that she could find some companionship in light of her tremendous loss, Mr. Grimm rescued and gave her a dachshund as a gift.  Ms. Dresch affectionately calls the dog "Little Mikey" and says it helps bring her the "unconditional love that had been missing in [her] life since that stormy night."  *See id.*  Ms. Dresch concludes her letter by stating:

I often wondered why I was chosen to survive that night, why I was given a second chance.  I am sure that I am here to keep Angela and George's spirit alive and to help advocate for other survivors.  Michael Grimm has helped to give me that

15

second chance.  It is my sincerest wish that this court can see the true nature of this man's heat, and offer him a second chance as well.

*See id.*

### E.     Mr. Grimm's Role as Caretaker and Caring Friend

When his father was very ill and near death, Michael promised him that he would take care of his mother, Petrina, and sister, Deborah.  (P. Grimm Ltr., Ex. A).  Michael has kept that promise.  In 2012, Michael's mother, who suffers from emphysema and severe diabetes, moved into his residence.  *See id.*; PSR ¶ 36.  His mother's diabetes requires her to maintain a very strict diet, monitor her blood sugar levels several times a day, and take insulin injections 3-4 times a day.  *See id.*  Before she moved in with Michael, she had several incidents where she fainted due to low blood sugar and was hospitalized.  *See id.*  On one occasion in 2010, before she moved in with Michael, his mother fainted due to low blood sugar and fell down steps in her home, breaking her clavicle bone and sustaining contusions on her face, head, ribs, and arm.  *See id.*  Had she not been found in time after these fainting episodes, she could have ended up in a diabetic coma.  *See id.*

Because of these incidents, Michael moved his mother into his home and became her sole caretaker and provider.  *See id.*  In that capacity, Michael ensures that his mom monitors her blood sugar and takes her medications; drives her to her doctors' appointments and screenings; and generally manages all of her healthcare matters.  *See id.*

There is no one else who can care for Michael's mother.  His sister, Deborah, who is unemployed and also resides in Michael's home, suffers from a severe, debilitating depression.  *See id.* ¶ 38.  Michael also provides for her financially and is her caretaker.  (D. Grimm Ltr.; P. Grimm Ltr., Ex. A).  Deborah Grimm states of her brother:

> He has been my life-long rock and the only stable force in my life.  For the past 3 years he has been my sole financial and emotional supporter through what has been a downtown in my long struggle with depression.  I rely on him completely, and he

has always been there for me, no matter how busy he was with his own responsibilities.

…

Since my father's death, Michael has taken on the responsibility of caring for me and my mother. We moved into his house in Staten Island and rely on him for nearly everything both financially and emotionally. He is the only one my mother will listen to regarding her medical conditions and need for medical care . . . I do not drive on highways or bridges and thus rely solely on my brother to take Mom to Queens where most of her doctors are.

(D. Grimm Ltr., Ex. A). Michael's mother notes that any sentence of incarceration for her son will greatly impact her family because of their reliance on Michael:

He is more than a caregiver that takes me to my doctors and makes sure I remember to test my blood sugar regularly, he is the rock, the foundation that my daughter and I rely on every day of our lives and I'm terrified of the idea that he won't be there. . . . Michael's sister and I depend upon and need him desperately. Frankly, I have little means or support and his sister is totally dependent upon him.

(P. Grimm Ltr., Ex. A).

Michael's personal sacrifices and compassion also extend to his friends. For instance, Mr. Molinari, who is 86 years old, states:

Michael may be one of the most caring and compassionate persons I have ever met; at my age I can barely walk and rarely leave the house, but Michael calls me every day, visits me several times per week, brings me food, checks with my doctors and so on. In short, Michael has become one of my primary caretakers. Even though I no longer have much to offer him other than moral support and words of encouragement, Michael has remained steadfast and loyal, taking great care of me, often spending Friday or Saturday nights with me to watch boxing matches on TV when I know he has other places to be. Never once has he complained about running around to get me what I need or spending a few hours just keeping me company . . . He has become a son to me and he very much acts like you would want your son to act, simply with love. . . . As someone who lives in constant pain, often unbearable, I desperately rely on Michael's routine visits when he changes my medicine patches . . . and forces me to eat when I just don't have the strength.

(G. Molinari Ltr., Ex. A).

Other friends recount similar examples of Michael's kindness and compassion. Robert Kobus recounts that when his sister was killed in the September 11, 2011 terrorist attacks, Michael

17

regularly spent hours with Mr. Kobus and his family and took Mr. Kobus "to the various make-shift morgues that were set up [to] . . . drop off samples of [his] sister's DNA in the hope of finding her remains."  (R. Kobus Ltr., Ex. A).  Mr. Kobus remarks, "I honestly don't think I or my family would have been able to get through my sister's death without Michael Grimm's support or friendship.  His devotion and compassion to my family during such a tragic time is something I will never forget."  *See id.*

Liam McCabe, who previously worked on Mr. Grimm's Congressional staff, describes how Mr. Grimm served as a mentor and helped him through a difficult time in his life:

> [T]here is a history of alcoholism in my family.  My father died a homeless veteran, due mostly to the disease of alcoholism, which had ravaged his life.  This was not something that I publicly talked about much or told many people, but I was able to share it with [Michael] as my own excessive drinking became apparent.  What Michael did with me was life-changing.  We talked, not only about my father's alcoholism, but his own father's as well and what it was like dealing with being the adult child of an alcoholic.  His understanding and willingness to work with me on my own problems drinking helped me to become a better employee, a better citizen, and a better father to my own two boys.  He supported me and encouraged me to seek the help that I needed to progress in life. . . . [H]e was an emotional rock for me to lean on and gain strength in my own personal affairs. . . . And for that I am eternally grateful.

(Ltr. from L. McCabe, Exhibit A).

Maria Ciccia, a friend of Michael's from law school, tells a similar story:

> When we met he was an FBI agent who worked all day before spending long nights at school.  I, on the other hand, was struggling through school under the weight of the losses of my father and sister . . . . From the first day of our friendship, Michael was always there for me.  He listened to me and talked me through the horrible grief that was consuming me.  He supported me and encouraged me to keep moving forward toward completing law school and passing the bar.  His unyielding support and comfort during those time[s] was single-handedly the most significant demonstration of love and support I have ever received.

(M. Ciccia Ltr., Ex. A).

Finally, Mr. Bonura, a lifelong friend, recounts Michael's generosity and describes the fundamental impact he has had on his life:

> When I decided to start my own business and needed monies to do so, it was Michael who offered all of his savings to get me started. This was the second time in our lives that he gave me almost everything he had just so I would have a chance at happiness and success. . . . [H]e [is] the role model I use for my son as he grows into a man. I can only hope he has the moral character, tenacity, desire, focus and caring and loving nature that I have known Michael to have his entire life. In many ways Michael saved me from [a] life of drinking, drugs and inevitably crime. I owe him all that is good in my life . . .

(R. Bonura Ltr., Ex. A).

In sum, these letters and others show this Court Michael Grimm's true character: a selfless man with good values who cares deeply for his family, friends, and community.

## III.  BACKGROUND FACTS RELATING TO OFFENSE CONDUCT

### A.  Mr. Grimm and His Partners Open Healthalicious

In 2006, when Mr. Grimm left the FBI (and well before he ever sought public office), he was interested in opening a healthy quick serve restaurant in New York City. Because Mr. Grimm did not have any experience in owning or operating a restaurant, he sought to partner with someone who could offer that operational expertise. Through a mutual friend, he was introduced to Bennett Orfaly, an experienced restaurateur who, at the time, owned and managed a chain of over a dozen QSRs (in addition to several other stand-alone, full service restaurants), which he franchised throughout New York City and New Jersey. Subsequently, Mr. Grimm, another equity partner in the restaurant, Brad Leffe, and Mr. Orfaly agreed to open a restaurant named Healthalicious, which was to be modeled after Mr. Orfaly's already-existing QSR franchises but with a different branding and a health conscious menu. In November 2006, Mr. Grimm, Mr. Leffe, and Mr. Orfaly formed Granny Sayz, LLC (d/b/a Healthalicious), a New York limited liability company, as the corporate

entity by which they would operate Healthalicious.  Mr. Grimm held a 45% ownership interest in Granny Sayz; Mr. Orfaly held 35% ownership; and Brad Leffe owned a 20% interest.

Mr. Grimm and his partners opened Healthalicious in a small 550 square foot space on the Upper East Side of New York City, taking over space from one of Mr. Orfaly's already existing franchise restaurants.  As planned by Mr. Orfaly, Healthalicious was modeled after and run like his franchise restaurants and shared their resources.  Mr. Orafaly's goal was to cut down on Healthalicious' business costs by leveraging his existing franchise operations and implementing his franchise's same operational and administrative systems and procedures (including payroll processes).  Specifically, Healthalicious utilized Mr. Orfaly's franchise's corporate office in Manhattan for all human resources matters, including the hiring and firing and training of its employees; its employees were pulled from the franchise's pool of employees or worked at both Healthalicious and Mr. Orfaly's restaurants; it used equipment and machinery that previously belonged to Mr. Orfaly's franchise; and it contracted with the same vendors and marketing companies as Mr. Orfaly's franchise restaurants, among other things.

While Mr. Grimm oversaw some of Healthalicious' day-to-day operations, including reporting employees' pay-rates and their hours worked to the payroll processing companies and, at times, the distribution of wages to employees, all of which form the offense conduct, Mr. Orfaly and Mr. Perez were mostly responsible for the company's payroll procedures and human resource components.  Mr. Grimm focused more on handling the marketing, customer service, and other related areas.  To the extent that Mr. Grimm was involved in the restaurant's payroll processes and human resources, it was based on protocols that Mr. Orfaly and Mr. Perez already had in place at the franchise restaurants, or on training provided by Mr. Perez.

**B.      Mr. Grimm Decides To Sell His Stake In Healthalicious**

In 2007, when Mr. Grimm's father was diagnosed with terminal cancer, Mr. Grimm took the last few months of the year off from the restaurant to help coordinate his father's care, research medical options, and attend all of his father's medical appointments.   After returning to Healthalicious for only a few months in the beginning of 2008, Mr. Grimm's father passed away. Immediately thereafter, Michael took another several months off from the business so that he could tend to his mother and help coordinate his family's affairs.

When Mr. Grimm returned to the restaurant, he returned to a business that (as with other businesses and restaurants in the area) was struggling tremendously because the Second Avenue subway construction project had severely reduced foot traffic.  Healthalicious' sales were down significantly and bills had gone unpaid for months.  Mr. Grimm tried to convince his partners to close the restaurant, but they refused.  At this juncture (in 2008), Mr. Grimm, whose name was on the restaurant lease, which he had personally guaranteed, spent the majority of his time concerning Healthalicious not managing the business, but attempting to sell his interest in it.

Ultimately, Mr. Orfaly agreed to purchase Mr. Grimm's interest.  In April 2009, Mr. Grimm sold his full ownership interest in Healthalicious to Mr. Orfaly for US $75,000, which Mr. Grimm allowed to be paid in installments.  From late 2009 through 2010, because he was being sued by Healthalicious' landlord for unpaid rent and was exposed to other liabilities of the restaurant, including over US $23,000 for a business credit card and utility deposits, Mr. Grimm was marginally involved in Healthalicious.  He agreed to help Mr. Perez with the restaurant in cases of emergency, including on a few occasions where he filled in for Mr. Perez at the restaurant and performed the payroll by e-mailing Mr. Perez the payroll spreadsheet (originally prepared by Mr. Perez) providing the amounts to be paid to Healthalicious employees.  While providing this

*ad hoc* assistance (in late 2009 through 2010), Mr. Grimm did not hold an ownership or other beneficial interest in Healthalicious.

## IV.   THE ADVISORY SENTENCING GUIDELINES[1]

### A.   The Presentence Investigation Report and Plea Agreement

The statutory maximum term of imprisonment for a conviction under 26 U.S.C. § 7206(2) is three (3) years.  *See* § 7206.  The Presentence Investigation Report ("PSR") prepared in this case sets forth the following Guidelines calculation:

|  |  |
|---|---|
| Base Offense Level (§§ 2T1.4(a)(1) and 2T4.1(F)) | 16 |
| Aggravating role as organizer / leader (§ 3B1.1(a)) | +4 |
| Adjustment for obstruction of justice (§3C1.1) | +2 |
| Acceptance of responsibility (§3E1.1(a) and (b)) | -3 |
| Total Offense Level | 19 |

*See* PSR ¶¶ 21-27.   In the plea agreement, the Government set forth a similar Guidelines calculation, except that it believes that a two point enhancement under § 3B1.1(c)—not a four point enhancement—is appropriate in these circumstances and, thus, that the total offense level should be a level 17.  *See* Plea Agreement ¶ 2.  With Mr. Grimm's criminal history level of I, a total offense level of 17 results in a Guidelines range of 24-30 months' imprisonment.

Mr. Grimm has not stipulated to any facet of the Guidelines calculation except for the base offense level and believes that his total offense level should be a level 13, resulting in a Guidelines range of 12-18 months' incarceration.  *See id.*

---

[1]    The preliminary PSR was published on May 11, 2015.  Mr. Grimm submitted his Objections to that Report on May 26, 2015, and filed them on June 19, 2015.  These arguments are based on the findings in the preliminary PSR.

**B.      Mr. Grimm's Objections To The PSR's Guidelines Calculation**

Mr. Grimm objects to the PSR's aggravating role enhancement under §3B1.1 and the obstruction of justice enhancement under § 3C1.1.  Neither enhancement should apply.

*1.   An Aggravating Role Enhancement Is Improper*

Mr. Grimm objects to the PSR's four point aggravating role enhancement under §3B1.1(a) based on its finding that Mr. Grimm was a leader or organizer of a criminal activity involving more than five (5) participants.  *See* PSR ¶¶ 13, 15.  As noted above, even the Government disagrees with this enhancement, and instead advocates for a two point enhancement under § 3B1.1(c).  Nonetheless, the facts here do not warrant any aggravating role enhancement under § 3B1.1.

The PSR's proposed four point enhancement is not appropriate because the criminal activity at issue did not involve more than five (5) participants as required under § 3B1.1(a).  Under the Guidelines, a "participant" is defined as an individual "who is criminally responsible for the commission of the offense, but need not have been convicted."  *See* Guideline § 3B.1, Application Note 1.  Thus, only "knowing" participants can be counted towards the number of participants.  *See United States v. Paccione*, 202 F.3d 622, 624 (2d Cir. 2000).  With respect to Mr. Grimm's offense conduct and other related conduct, there were no participants under § 3B1.1 other than Mr. Grimm, Mr. Perez, and Mr. Orfaly.  While the PSR states that the so-called "Healthalicious Accountant" prepared the restaurant's tax filings, as is evident from the PSR's own description of this accountant's involvement, he was neither aware of, nor criminally responsible for, the offense conduct because he was unaware of Healthalicious' so-called "off-the-books" wages.  *See* PSR ¶ 13.  Thus, he cannot be counted as a participant.  *See Paccione*, 202 F.3d at 624.

Further, the PSR appears to incorrectly conclude that "various" unnamed Healthalicious employees—who it alleges were "largely undocumented aliens"—were participants under § 3B1.1

23

because they "agreed to be paid [their wages] in cash."  First, these individuals cannot be counted as participants without the PSR or Government specifically identifying them; obliquely describing these purported participants as "various employees" of Healthalicious clearly does not suffice for the purposes of this enhancement.  *See United States v. Lanese*, 890 F.2d 1284, 1292 (2d Cir. 1989) (reversing § 3B1.1 enhancement because court failed to make "specific finding as to the identities of the participants"); *see also United States v. Molina*, 356 F.3d 269, 275 (2d Cir.2004) ("Our precedents are uniform in requiring a district court to make specific factual findings to support a sentence enhancement under U.S.S.G. § 3B1.1.").  Second, even if these individuals were identified, they would still not constitute "knowing participants" in Mr. Grimm's offense conduct. These employees simply received all or part of their wages in cash in lieu of checks.  That they would be "able to avoid reporting their own earnings" and "avoid[ ] having to pay their own personal taxes" (*see* PSR ¶ 13) does not somehow convert their conduct into criminal activity or make them "criminally responsible" for or knowingly involved in Mr. Grimm's tax violation. There is absolutely no evidence—and certainly none proffered in the PSR—that these employees were in any way aware of, or involved in, Mr. Grimm's tax offense.[2]

A two point enhancement is similarly not warranted or appropriate in this case.  Mr. Grimm was not a "manager or supervisor"—much less a "leader or organizer"—in any criminal activity.

---

[2]      In applying the §3B1.1(a) enhancement, the PSR relies on a specific finding that there were five or more participants in the criminal activity; it does not appear to find that the criminal activity was "otherwise extensive."  *See* PSR ¶ 13.  However, it should be noted that the criminal activity here was not "otherwise extensive."  In determining whether an "organization" is "otherwise extensive," the Court is to consider "all persons involved during the course of the offense." *See* § 3B1.1, Application Note 3.  Here, there were only, at most, three participants—Mr. Grimm, Mr. Orfaly, and Mr. Perez—and there was one individual who provided "unknowing services," the Healthalicious accountant. The "various employees" did not provide such services: their receipt of cash wages was not a service performed in connection with Mr. Grimm's offense conduct.

See § 3B1.1(a) and (c).  "A defendant acts as a manager or supervisor . . . if he exercises some degree of control over others involved in the commission of the offense or plays a significant role in the decision to recruit or to supervise lower-level participants."  *See United States v. Payne*, 63 F.3d 1200, 1212 (2d Cir.1995).  In this case, Mr. Grimm did not exercise control over or recruit either Mr. Perez or Mr. Orfaly, the only other participants in the offense conduct.  Mr. Grimm had absolutely no restaurant experience and relied on Mr. Orfaly and Mr. Perez to train and direct him, which Mr. Perez did at the behest of Mr. Orfaly.  Though the PSR appears to allege that Mr. Perez was Mr. Grimm's subordinate, Mr. Grimm and Mr. Perez were equals in managing Healthalicious; indeed, if anything, Mr. Perez was the instructor and Mr. Grimm was the student.

From the outset, Manuel Perez, on behalf of Mr. Orfaly (and later in his role as a co-owner), assisted in implementing the payroll system and other administrative and operational processes from Mr. Orfaly's franchises at Healthalicious.  Mr. Perez provided Mr. Grimm with the paperwork, schedules, and all processes used for the restaurant's payroll, and trained Mr. Grimm on how to prepare the spreadsheet for the employees' wages and perform other payroll functions. Moreover, it was Mr. Perez (with Mr. Orfaly) who set employee wages during the hiring process, which was handled exclusively at Mr. Orfaly's franchise corporate office, and who determined whether any portion of the employee salaries would be paid in cash.

That Healthalicious implemented the pre-existing payroll practices of Mr. Orfaly's and Mr. Perez's franchise restaurants is evidenced by the fact that multiple lawsuits have been filed by employees of Mr. Orfaly's franchise restaurants (unrelated to Healthalicious) against Mr. Orfaly alleging that he paid the plaintiffs their wages in cash—which is part of the offense conduct in this case—and violated the minimum wage and overtime wage provisions of the Fair Labor Standards Act.  *See* Second Amended Complaint, *Reyes v. Orfaly*, No. 07-cv-00196-RJS (S.D.N.Y.) (DE 20

at ¶ 51) ("Defendants paid Plaintiffs at times wholly or partly in cash . . . ."); *see also* Amended

Complaint, *Angamarca v. Orfaly*, No. 11-cv-07777-JGK (S.D.N.Y.) (DE 62 at ¶98) ("All Plaintiffs

were paid their wages entirely in cash."); Amended Complaint, *Rodriguez v. Orfaly*, No. 13-cv-

00463-PGG (S.D.N.Y.) (DE 2 at ¶ 70) ("Plaintiff . . . received a check for the first 40 hours and

cash for the hours over 40 at the base rate.").[3]

On these facts, it is clear that Mr. Grimm did not supervise or manage Mr. Perez, but rather

that Mr. Perez was his equal and instructed and guided him in managing the restaurant, including

in the conduct forming Mr. Grimm's offense.  In this scenario, where the only other participants

in the criminal activity (Mr. Perez and Mr. Orfaly) are the defendant's equal, a § 3B1.1

enhancement is improper.  *See United States v. Greenfield*, 44 F.3d 1141, 1146 (2d Cir. 1995) ("§

3B1.1 enhancement inapplicable when two participants bear equal responsibility for organizing

their own commission of a crime") (internal quotations and citations omitted).  Further, if the

"various" Healthalicious employees are also counted as "participants," which they clearly should

not be, it was Mr. Perez—not Mr. Grimm—who recruited and hired them through the franchise's

corporate office.[4]

---

[3]     To be clear, Mr. Grimm fully accepts responsibility for his actions when it comes to his tax
violations, and admits that he paid certain employees "off the books" in cash and that he
underreported Healthalicious' income. We submit that these details of his offense conduct are
relevant to a determination of his level of culpability and role in the offense.

[4]     Because an enhancement for acting as a manager or supervisor is not appropriate, the more
serious enhancement for acting as an "organizer" or "leader" under § 3B1.1(a) certainly does not
apply here.  In distinguishing between a leadership or organizational role and one of management
or supervision, courts should consider "the exercise of decision making authority, the nature of
participation in the commission of the offense, the recruitment of accomplices, the claimed right
to a larger share of the fruits of the crime, the degree of participation in planning or organizing the
offense, the nature and scope of the illegal activity, and the degree of control and authority
exercised over others."  *See* § 3B1.1, Application Note 4.  Again, the evidence shows that the
nature and scope of the illegal activity was not a large criminal enterprise or organization, but
rather a small restaurant with a tax loss of less than US $200,000.  Moreover, Mr. Grimm did not
initiate the practices that form the offense conduct but implemented pre-existing payroll practices

26

In sum, the Court should decline to impose any § 3B1.1 enhancement.  The Court should also strongly consider that in similar tax offense cases, the § 3B1.1 enhancement is applied sparingly.  *See* U.S. Sentencing Commission, FY 2013 CHAPTER THREE ADJUSTMENT REPORT at 84 (§ 3B1.1 enhancement applied in only 16.7% of convictions for § 7206).  Based on the facts and circumstances described in this memorandum, this case certainly should not fall within the small minority of cases where this enhancement applies.

## 2.   *The Obstruction of Justice Enhancement is Improper*

The PSR has applied, and the Government seeks, a § 3C1.1 obstruction enhancement based on Mr. Grimm's deposition testimony in *Perez v. Grimm, et al.*, Case No. 11-cv-8736 (S.D.N.Y.) (the "Civil Action"), a private FLSA civil action.  This deposition occurred on January 30, 2013— well before the Government's investigation of the instant offense.  As shown below, this enhancement is wholly inappropriate and has absolutely no legal support given the facts here.

The § 3C1.1 enhancement applies "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice *with respect to the investigation, prosecution, or sentencing of the instant offense of conviction*, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."  *See* § 3C1.1 (emphasis added).  To impose this enhancement, the Court must make specific findings as to Mr. Grimm's willfulness to obstruct justice with respect to the investigation of the instant offense and as to the materiality of the conduct.  *See United States v. Zagari*, 111 F.3d 307, 328-29 (2d Cir. 1997).  "The willfulness requirement means that the enhancement is appropriate only upon a finding that the defendant had the specific intent to

---

that his co-owners used at other restaurants.  Nor did he directly recruit any participants in the criminal activity.

obstruct justice, *i.e.*, that the defendant consciously acted with the purpose of obstructing justice." *See id*.  Moreover, where, as here, the allegedly obstructive conduct occurred in a private civil action *before* the investigation of the instant offense of conviction, the § 3C1.1 enhancement applies only if the civil proceeding "had some existing or expected connection to the later government inquiry," *see United States v. Chivers*, No. 11-10430, 488 Fed.Appx. 782, 789 (5th Cir. 2012), and "if the conduct was *purposefully calculated*, and likely, to thwart the investigation or prosecution of the offense of conviction."  *See* § 3C1.1, Application Note 1 (emphasis added). "It is not enough to show that the obstructive conduct simply impeded a civil investigation [or proceeding] that later turns out to relate (or lead) to a government investigation and an offense of conviction."  *See Chivers*, 448 Fed.Appx. at 789.

Mr. Grimm could not have willfully obstructed justice under § 3C1.1 through his January 2013 deposition testimony in the Civil Action because the testimony occurred well *before* the investigation of the offense conduct even existed and therefore before Mr. Grimm could have possibly had knowledge of any such investigation.  The PSR has not cited to any evidence (nor could it), demonstrating that the investigation into Mr. Grimm's tax violation was underway as of January 30, 2013, or, more importantly, showing that Mr. Grimm had knowledge of any such investigation at that time.  In fact, we understand from the Government that it did not even request that the IRS investigate Mr. Grimm until September 18, 2013 (nearly 8 months *after* the deposition in question), and that the Department of Justice did not approve of the tax case until March 27, 2014 (nearly 14 months after the deposition).  Mr. Grimm's potential awareness of separate investigations into fundamentally different matters is irrelevant: the § 3C1.1 enhancement requires a finding of specific intent to obstruct the investigation of the *instant offense of conviction*.  *See Zagari*, 111 F.3d at 238; *see also* § 3C1.1, Application Note 1.

28

Moreover, Mr. Grimm's deposition testimony was not "purposefully calculated, and likely, to thwart," the investigation of the instant offense because there was no existing or even potential nexus between the Civil Action and the investigation of the offense conduct.  The Civil Action was brought by private litigants who were Healthalicious employees who alleged that Mr. Grimm (and others) failed to pay them minimum and overtime wages in compliance with the FLSA, 29 U.S.C. § 201 *et seq*.  *See Perez v. Grimm*, No. 11-cv-8736 (D.E. 1).  The claims in the Civil Action did not pertain to whether Mr. Grimm violated the tax laws or committed the instant offense, nor did the proceeding involve, or have any expectation of involving, any governmental or regulatory authorities.  Further, at the time of Mr. Grimm's deposition in the Civil Action, not only had the Government not initiated its investigation into the offense conduct, but there were no other pending civil or regulatory investigations or proceedings regarding the allegations in the Civil Action. Rather, the Civil Action was a stand-alone civil lawsuit between private litigants, and Mr. Grimm had no reason to believe that it would somehow tangentially relate to a future Government investigation. *See Chivers*, 448 Fed.Appx. at 789.

In support of this enhancement, the PSR appears to exclusively rely on Application Note 4 to § 3C1.1, which lists as an example of conduct to which the adjustment applies "perjury . . . during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction."  *See* § 3C1.1, Application Note 4(B).  Significantly, however, the examples in this Application Note serve only to demonstrate the possible scenarios that may fall within the ambit of § 3C1.1; for the enhancement to apply, the conduct at issue must still be "purposefully calculated . . . to thwart the investigation or prosecution of the offense of conviction."  *See* Guideline § 3C1.1, Application Note 1.  As shown above, that fundamental requirement is not satisfied here.

29

Indeed, the typical situation where a false statement in a prior civil proceeding as set forth in Application Note 4(B) is found to fall within the ambit of the § 3C1.1 enhancement is where a defendant commits a false statement in a civil or regulatory government investigation into the offense conduct that precedes a criminal investigation. *See, e.g., United States v. Rajaratnam*, No. 09 CR. 1184 RJH, 2012 WL 362031, at *18 (S.D.N.Y. Jan. 31, 2012) (§ 3C1.1 enhancement applied to perjury in SEC proceeding: "Where federal administrative and prosecutorial jurisdiction overlap, subsequent criminal investigations are often inseparable from prior civil investigations, and perjury in the prior proceeding necessarily obstructs—if successful, by preventing—the subsequent investigation."). For example, there are cases where courts have applied the § 3C1.1 enhancement because a defendant perjured himself in, for example, a SEC or IRS investigation or proceeding prior to a related criminal investigation. But this situation is far different than those.

Here, Mr. Grimm's testimony in the Civil Action cannot plausibly have been intended to obstruct an investigation (into the offense conduct) which was not yet in existence, and which did not have any reasonable nexus or expected connection to the Civil Action. This is a situation where a false statement in a civil action is "utterly" unrelated to the investigation of the instant offense and, thus, the willfulness requirement central to the § 3C1.1 enhancement cannot be satisfied. *See Zagari*, 111 F.3d at 328. Moreover, we have not found, nor has the Probation Office or Government produced, any cases analogous to this one where the § 3C1.1 was found to apply.[5]

---

[5]   In addition, and as a side issue, the deposition testimony in the Civil Action at issue did not constitute perjury under § 3C1.1 because the subject matter was immaterial. To impose a § 3C1.1 enhancement based on a false statement in a proceeding separate from the instant investigation, the Court must find that the statement at issue was material to both the separate proceeding and to the instant offense. *See Zagari*, 111 F.3d at 329. For the purposes of § 3C1.1, a material fact is one "that, if believed, would tend to influence or affect the issue under determination." *See* § 3C1.1, Application Note 6. Here, Mr. Grimm's testimony regarding both cash payments to Healthalicious workers and his use of e-mail concerning Healthalicious' business matters was not material to the claims in the Civil Action because it had no bearing on the ultimate issue in that

Accordingly, the § 3C1.1 enhancement clearly should not be applied in this case.

## V.     THE SECTION 3553(a) FACTORS FAVOR A DOWNWARD VARIANCE

The Supreme Court and Circuit Courts across the country encourage sentencing courts to exercise great discretion in imposing a just and fair sentence. *See e.g.*, *Spears v. United States*, 555 U.S. 261 (2009); *Rita v. United States*, 551 U.S. 338 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007); *United States v. Booker*, (2005).  In the post-*Booker* era, the sentencing court's duty is to consider all of the factors identified in 18 U.S.C. § 3553(a) and "impose a sentence sufficient, but not greater than necessary" to comply with the four purposes of sentencing set forth in the statute.  Following *Booker*, district courts must impose a sentence in accordance with the factors set forth in 3553(a), of which the advisory United States Sentencing Guidelines "now serve as one fact among several [that] courts must consider in determining an appropriate sentence." *Kimbrough*, 552 U.S. at 90.

Pursuant to § 3553(a), the sentence imposed must: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner.  *See* 18 U.S.C. § 3553(a)(2).  In addition, § 3553 requires the sentencing court to consider

---

litigation— whether the plaintiffs were owed back wages under the FLSA.  Mr. Grimm's liability for FLSA violations in the Civil Action was based on a very simple inquiry: the number of hours worked by the plaintiffs and how *much* they were paid, not how they were paid.  The fact that Mr. Grimm used certain e-mail accounts or made payments to those plaintiffs via cash or checks was irrelevant to that case, and neither topic was material to a determination of whether Mr. Grimm committed the tax violation for which he was convicted in the instant case.  Mr. Grimm's use of certain e-mail accounts and the cash payments are merely peripheral facts with respect to the central issue for the instant offense: whether Mr. Grimm submitted false tax returns.  As a result, the § 3C1.1 enhancement is also improper because Mr. Grimm's statements in the deposition fail to satisfy the materiality requirement.

the following factors (in addition to the advisory Guidelines range and any pertinent policy statements issued by the Sentencing Commission) in imposing a sentence: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the kinds of sentence available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victims of the offense.  18 U.S.C. 3553(a)(1)-(7).

Under § 3553, the advisory Guideline range receives no presumption of reasonableness, nor does any presumption of unreasonableness attach to a sentence that varies from the Guideline range. *See Gall v. United States*, 522 U.S. 38, 52 (2007); *see also id.* at 52 ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") (quoting *Koon v. United States*, 518 U.S. 81, 98 (1996)).  The Court "may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors [under § 3553(a)], aided by the arguments of the prosecution and defense.  *See United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008).  A downward variance from the Sentencing Guidelines is neither presumed to be unreasonable nor does it require "extraordinary circumstances."  *See United States v. Urena*, 425 Fed.Appx. 6, 9 (2d Cir. 2011).  *See also United States v. Verkhoglyad*, 516 F.3d 122, 136 (2d Cir.2008) (explanation for non-Guidelines sentence need not be "extensive or detailed").

In this situation, full consideration of the § 3553(a) factors warrants a variance for Mr. Grimm to a sentence of probation.  As shown below, a non-custodial sentence properly takes into consideration Mr. Grimm's remarkable personal history, the nature of his offense, the punishment

32

and losses that Mr. Grimm already has suffered as a result of his conduct, and sentences imposed on other defendants for the same or similar offenses.

### A.      Nature and Circumstances of Mr. Grimm's Offense

Mr. Grimm is extremely remorseful for and does not take lightly his tax offense.  That said, a close examination of the nature and circumstances of his offense conduct—specifically, his role and the type of offense—support a non-custodial sentence.

First, it is clear that Mr. Grimm did not devise and was not the driving force behind the payroll and accounting practices that form the offense conduct.  Before his involvement in Healthalicious, Mr. Grimm had never owned or operated a restaurant.  For that reason, in establishing Healthalicious, Mr. Grimm partnered with Mr. Orfaly who had extensive experience in the restaurant industry and an operational and administrative infrastructure already in place.  Healthalicious was run exactly like Mr. Orfaly's other restaurants: it used the same payroll and accounting systems and protocols and employed the same hiring practices, all of which form the basis of Mr. Grimm's tax violation.  Thus, while Mr. Grimm was certainly aware of and involved in the offense conduct, in assessing his role in the violation and the degree of his culpability, it is important to note that he did not initiate the scheme to commit the violations.[6]

Second, the nature of Mr. Grimm's violation strongly counsels for a sentence of probation.  The facts show that this offense was hardly a massive tax evasion scheme.  Mr. Grimm is facing sentencing for one violation of 26 U.S.C. § 7206(2) in tax year 2009, and is responsible for a total tax loss over four years of US $166,514, which is closer to the bottom end of the applicable tax loss offense level under the amendments to the Guidelines effective as of November 1, 2015.  *See*

---

[6]      The FLSA suits against Mr. Orfaly by his franchise employees support such a factual finding.  *See supra* 26.

U.S. Sentencing Commission, AMENDMENTS TO SENTENCING GUIDELINES (April 2015) at 20 (amendment to § 2T4.1).  Healthalicious was a small restaurant that struggled to break even.  To keep it afloat, Mr. Grimm under-reported its income and paid some of its workers "off the books." Mr. Grimm did not use any cash receipts that he failed to report to line his own pockets, but instead used that cash to pay Healthalicious' vendors, who provided discounts for upfront cash payments. While this is inexcusable, put into context, a tax violation of this type is relatively commonplace compared to other tax evasion schemes, such as those involving tax preparers who operate false tax return mills or schemes involving companies or individuals evading millions in taxes.  *See, e.g., United States v. Warner*, Case No. 13-cr-731 (N.D.Ill.) (defendant, who received sentence of probation, concealed over US $20 million in income and assets held overseas, resulting in tax loss of US $5.5 million); *United States v. Olenicoff*, Case No. 7-cr-227 (C.D.Cal.) (defendant convicted for violation of § 7206(1) with US $52 million civil tax liability sentenced to probation).

Indeed, there are several thousands of lawsuits or regulatory proceedings brought every year regarding "under-the-table" cash payments and underpayments to employees—very similar to certain aspects of Mr. Grimm's case.  For example, in 2012, over 8,000 FLSA private suits were filed in federal courts across the country, almost a quarter of which were brought by employees in the accommodations and food services industry.  *See* United States Governmental Accountability Office, *Fair Labor Standards Act: The Department of Labor Should Adopt a More Systematic Approach to Developing Its Guidance*, Dec. 2013, at 13.  In fact, a substantial percentage of these FLSA suits are brought in federal court in New York.  *See* Jacqueline Bell, Florida, *Florida, NY Top List of Busiest Courts for FLSA Suits*, LAW 360 (May 2, 2015) (in 2014, over 1,600 FLSA private actions brought in Southern and Eastern District of New York).  Further, the U.S. Department of Labor and the New York State Department of Labor also bring numerous civil

proceedings for violations of minimum wage and overtime payment laws. *See Fiscal Year Statistics*, U.S. Department of Labor, Wage and Hour Division (over 11,000 minimum wage violation cases brought in fiscal year 2014 by U.S. Department of Labor).

The allegations in these FLSA suits and other related regulatory actions, if true, often times implicate tax liability issues for employers because, as here, off-the-books cash payments and under-paid wages result in under-reported payroll tax liability, which can give rise to criminal tax liability. *See, e.g.*, Sachin S. Pandya, *Tax Liability for Wage Theft,* 3 COLUM. J. TAX. L. 115 (2012) (describing various ways that underpayment of wages in violation of FLSA can give rise to criminal tax liability). Nonetheless, the Government rarely, if ever, even investigates the allegations of these suits and brings related criminal tax cases. In fact, an exhaustive search of reported criminal cases against restaurant owners for hiring employees "off the books" and under-reporting income failed to reveal even one single case filed in the District within the last decade, despite the several thousands of private FLSA actions and regulatory enforcement actions (resulting in only civil fines) brought in this very District over this period of time.

For example, we have identified several New York State Department of Labor proceedings involving underpayment of employees similar or more egregious than what occurred at Healthalicious; however, none of those cases resulted in related federal criminal proceedings for tax fraud or other related charges. *See, e.g.*, *In re Young Lee Oh, NY Industrial Board of Appeals*, No. PR 11-017 (May 22, 2014) (affirming judgment ordering payment of over $300,000 in unpaid wages due to 38 employees and entering civil money penalty); *In re Ji Sung Yoo*, NY Industrial Board of Appeals, No. PR 11-174 (Feb. 27, 2014) (affirming order requiring payment of $555,973.03 in unpaid wages and imposing a $1.9 million civil money penalty); *In re Zi Qi Chan*, NY Industrial Board of Appeals, No. PR 10-060 (Mar. 20, 2013) (affirming $110,250 civil penalty

based on unpaid wages); *In re Yick Wing Chan*, NY Industrial Board, No. PR 08-174 (Oct. 17, 2012) (affirming order of $116,952 civil money penalty due to unpaid wages to eight workers).

This is not to suggest that Mr. Grimm years ago did not make a bad choice that has forever altered his life.  However, the Court should consider where Mr. Grimm's offense falls on the spectrum of tax offenses in fashioning a fair and just punishment.  Taking into consideration the severity and nature of Mr. Grimm's violation compared to other taxes cases, we respectfully submit that a substantial variance to probation is warranted.

**B.     Mr. Grimm's History and Characteristics**

Michael Grimm's personal history, background, and characteristics are crucial considerations in his sentencing and warrant a sentence of probation.  *See Gall*, 552 U.S. at 52 (2007) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").

In this proceeding, in assessing Mr. Grimm, this Court is faced with an individual with an unblemished criminal history, whose life has been nothing short of extraordinary in its commitment to service of this country and those in need, whether they be friends, family, or members of the community.  Mr. Grimm's upstanding personal history does not negate his offense, but warrants that the Court exercise leniency so as to account for a rich history of compassion and impose a non-custodial sentence.

1.   Mr. Grimm's Military Service

*First*, and most significantly, Mr. Grimm's selfless and decorated service to this country in the First Gulf War compels a substantial downward variance.  The Supreme Court has expressly noted that, "Our Nation has a long tradition of according leniency to veterans in recognition of

36

their service, especially for those who fought on the front lines." *See Porter v. McCollum*, 558

U.S. 30, 43 (2009). Military service, especially of the kind provided by Mr. Grimm, on the front

lines of combat, is an important mitigating factor for the courts when considering the § 3553(a)

factors and the imposition of a downward variance. *See Kimbrough v. United States*, 552 U.S. 85,

110 (2007) (in affirming a significant variance, ruling it was appropriate for the Court to vary

downward because defendant "had served in combat during Operation Desert Storm and received

an honorable discharge from the Marine Corps"); *United States v. Canova*, 412 F.3d 331, 358-359

(2d Cir. 2005) (affirming a pre-*Booker* 6-level downward departure based in part on defendant

having volunteered for Marine Corps as a college student and "honorably served his country for

six years, mostly in the active reserves); *United States v. Howe*, 543 F.3d 128, 139 (3d Cir. 2008)

(sentence of probation in wire-fraud case affirmed where court varied downward from advisory

guidelines range of 18-24 months in part due to defendant's military service and honorable

discharge); *United States v. Nellum*, 2005 WL 300073, No. 2:4-cr-30, at *4 (N.D.Ind. Feb. 3, 2005)

(granting a substantial downward variance: "[T]his Court finds it very relevant that a defendant

honorably served his country when considering his history and characteristics."); Sentencing

Guidelines, App. C, Vol. III, at 305-51 (Nov. 1, 2011) ("[military] service has been recognized as

a traditional mitigating factor at sentencing"). *Cf. id.* § 5H1.1 ("Military service may be relevant

in determining whether a departure is warranted.").

  As described above, Mr. Grimm's over four years of military service in defense of this

country—for which he volunteered—were exemplary and courageous.  Mr. Grimm volunteered

for the Marines when he was in college, leaving behind a scholarship; when he was deployed in

Operations Desert Shield and Desert Storm, he volunteered for dangerous combat missions even

though he was assigned to a non-combat unit; and in his combat operations, he served with such

bravery and valor that he received a combat meritorious promotion for his "outstanding leadership on the battlefield."  As stated by his commanding officer, Michael Grimm was one of the "finest Marines a man could ask for."  *See supra* 9.  Even after the near death experience of being blown-up in a Humvee vehicle that hit an anti-tank mine, he insisted on staying on the front lines and again volunteered for extremely dangerous missions, including walking on foot through the very same minefields to bring enemy prisoners to safety.  Once again, this exemplary conduct emphasizes the type of person that Mr. Grimm is and always has been, someone that will give all of himself to serve his country and others.

Mr. Grimm's brave service to this country should not be overlooked by this Court in this proceeding:  there is a debt of gratitude that this country owes to its veterans that must be considered in sentencing, especially where, as here, the defendant has a previously unblemished criminal history and upstanding background.  As several other courts have done, and as the Supreme Court has recognized is appropriate, this Court should follow the "long tradition of according leniency to veterans . . . who fought on the front lines," and vary downward on account of Mr. Grimm's prior military service.  *See Porter*, 558 U.S. at 43.

## 2.  Mr. Grimm's Service to His Community and Care For Others

In varying downward to a non-custodial sentence, the Court should also take into consideration Mr. Grimm's extensive service to his community and his countless acts of compassion and support for those in need.  In connection with Mr. Grimm's sentencing, 35 individuals submitted letters on his behalf, urging the Court be lenient.  As the Court reads these letters, one overarching theme becomes clear:  that during his entire life (even as a child and up through the present day) Michael Grimm has possessed a unique sense of compassion for others and engaged in countless acts of selflessness and service for those in need.  In these letters,

38

examples of acts of kindness and empathy include, among others: volunteering in high school as a student counselor for children with alcoholic fathers; helping a cancer-stricken friend who could barely walk to and from school; emotionally and openly supporting a colleague in his whistleblower suit at the risk of alienating himself and damaging his own career; serving as a caretaker for a mentor in his old age; helping a target of one of his own FBI undercover investigations rehabilitate himself and get his life back on track; and going to great lengths to assist constituents who were victims of Hurricane Sandy or were otherwise in need.

So many of the individuals who wrote letters—who were associated with Mr. Grimm at different stages in his life—stated that Mr. Grimm's support and assistance was life-changing, that it helped them recover from great losses, gave them the strength to persevere in trying circumstances, or helped them obtain a measure of justice or peace.

These voices should be heard during Mr. Grimm's sentencing and merit significant weight. In *United States v. Serafini*, the Third Circuit affirmed a 3-level downward departure in a pre-*Booker* sentence based on prior charitable work and acts of generosity by the defendant, who was a "popular state legislator" in Pennsylvania. *See* 233 F.3d 758, 762, 773-74 (3d Cir. 2000). The *Serafini* Court found the departure was appropriate because "[s]everal constituents and friends described situations in which Serafini extended himself to them in unique and meaningful ways during times of serious need." *See id.* at 773. The court specifically described three letters where a friend, a constituent, and an employee of Mr. Serafini attested to acts of kindness; the Court also noted that "[t]he remaining letters, taken as a whole, depict Serafini as an exceptionally giving person." *See id.* at 774. Further, similar to the acts described in the letters submitted on behalf of Mr. Grimm, the district court in *Serafini* noted:

> Those weren't acts of just giving money, they were acts of giving time, of giving one's self. That distinguishes Mr. Serafini, I think, from the ordinary public servant,

from the ordinary elected official, and I had ample testimony, today, that says that Mr. Serafini distinguishes himself, that these are acts not just undertaken to assure his re-election, but are taken because of the type of person he is....

*See id*. at 775.

In *United States v. Tomko*, the Third Circuit affirmed a below-Guidelines sentence of probation for a defendant convicted of tax evasion, where the variance was granted in large part because of defendant's "involvement in exceptional charitable work and community activity." *See* 562 F.3d 558, 563 (3d Cir. 2009). The district court in *Tomko* placed substantial weight on the fact that the defendant's charitable acts including not only donating money but giving of his "personal time," including participating in holiday gift drives and his work with Habitat for Humanity. *See id*. at 572. And, in *Canova*, the Second Circuit affirmed a 6-level downward departure not only because of the defendant's prior military service, but also based on his "exemplary and many times courageous service as a volunteer fire fighter" and "Good Samaritan aid to three total strangers who were in extreme medical distress." *See* 412 F.3d at 358-59.

There are several other cases where courts have granted downward departures (in the pre-*Booker* era) or variances because, as here, a defendant has exhibited dedication to the well-being of others and a notable record of personal acts of generosity and compassion. *See, e.g*., *United States v. Campbell*, 765 F.3d 1291, 1300 (11th Cir. 2014) (granting a significant downward variance due to the defendant's "life of service and his compassion for his family but, more importantly for the court, for his fellow man as well.") (internal quotations omitted); *United States v. Cottingham*, 318 Fed.Appx. 159, 162 (4th Cir. 2008) (in a tax evasion case, affirming a downward variance to a six month sentence based on defendant's "lack of a prior criminal record, the extent of [his] community service, and the outpouring of support for [him]."); *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming downward variance based in part on

defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others"); *United States v. Weisberg*, 297 Fed.Appx. 513 (6th Cir. 2008) (affirming a 72% downward variance against defendant convicted of tax evasion with tax loss of US $321,654, (approximately double the tax loss in the instant case) where departure was based in part on defendant's community service)

In this circumstance, Mr. Grimm's lifelong commitment to helping others, as illustrated by many of the letters submitted by those whose lives he has touched, appears to be even greater than that of other defendants in similar cases where the court departed downward, and thus should further compel a downward variance to a sentence of probation. Mr. Grimm's dedication to serving the community and his long history of sacrifice and selflessness are integral considerations in a post-*Booker* sentencing and, here, counsel the Court to impose a non-custodial sentence.

### 3.  Mr. Grimm's Role as Caretaker for His Mother and Sister

It is well established that a defendant's role as a sole caretaker and source of financial support for a dependent family member may warrant a downward variance. *See United States v. Munoz-Nava*, 524 F.3d 1137, 1143-44 (10th Cir. 2008) (affirming a downward variance to sentence of a year and a day for defendant convicted for distributing heroin, in part because defendant was primary caretaker and sole supporter of his eight-year old son); *United States v. Schaadt*, 2015 WL 3466225, No. 10-cr-57, at *2 (N.D.Ind. June 1, 2015) (granting a downward variance based in part on defendant's role as primary caretaker for his 81-year old mother who had dementia and Parkinson's disease and for his brother-in-law and mother-in-law, who suffered from heart disease and congestive heart failure, respectively); *United States v. Colp*, 249 F.Supp.2d 740 (E.D.Va.2003) (awarding downward variance for defendant who was sole care-taker of spouse who had sustained a traumatic brain injury); *United States v. Kustrzyk*, No. 05-80216, 2007 WL

41

45929 (E.D.Mich. Jan. 4, 2007) (unpublished) (granting downward variance in part because defendant was primary caretaker for elderly and ill father).

This consideration also strongly supports a non-custodial sentence for Mr. Grimm.  As described above, Mr. Grimm is the sole caretaker and provider for his mother, Petrina, who lives with Mr. Grimm and suffers from emphysema and severe diabetes, and for his dependent sister, Deborah, who suffers from severe depression, has not been able to work in many years, and also lives with Mr. Grimm.  *See supra* 16-17.  Mr. Grimm's mother "relies upon him for everything," including ensuring that she monitors her blood sugar and takes insulin injections several times a day and driving her to numerous doctor's appointments.  *See id.*  Mr. Grimm's mother moved into his home in 2012 (after his father passed away) after multiple occasions when she failed to properly regulate her blood sugar levels, resulting in hospitalization and severe injuries.  *See id.*  If Mr. Grimm is sentenced to a term of imprisonment, there is no one else who can serve as a caretaker for his mother.  *See id.*

Similarly, Mr. Grimm's sister struggles with severe depression that renders her incapable of caring for her mother and to some degree for herself.  *See id.*  Mr. Grimm is the sole provider of financial support for his sister, who also lives in his residence.  Her debilitating condition has prevented her from being gainfully employed for more than seven years.  Mr. Grimm provides for all of his sister's financial needs in addition to providing her emotional support and security.  *See id.*  In their letters to the Court, both Petrina and Deborah Grimm make clear that a custodial sentence for Mr. Grimm will severely punish them as well, likely putting them in a position to become a burden to the State, relying on Government Assistance Programs to replace the support currently provided by Mr. Grimm.  As noted in the PSR, these facts counsel the Court to award a downward variance.

### C.    Imposing a Sentence That Is "Sufficient, But Not Greater Than Necessary"

A sentence more severe than probation for Mr. Grimm is unnecessary to satisfy the purposes of sentencing under § 3553(a)(2).  Mr. Grimm already has suffered immense loss due to his offense.  As a result of his guilty plea in this case, and as a gesture of his remorse, Mr. Grimm resigned from office as a Member of the U.S. House of Representatives immediately following his re-election to a third consecutive term.  *See* PSR ¶ 54.  Mr. Grimm's resignation was devastating for him because serving the people of Staten Island and Brooklyn was his passion and what he believes was his calling in life.  Further, Mr. Grimm resigned a year before his Congressional pension vested, resulting in a significant long-term financial loss for him.  Additionally, the New York State Bar Association suspended him from the practice of law, and moved to disbar him, with a decision pending on the outcome of this case.  The Connecticut State Bar Association also suspended him, and may move to disbar him following a judgment in this case.

Thus, as a consequence of his offense, not only has Mr. Grimm resigned from a job that he loved and in which he excelled, but he has suffered a tremendous loss in terms of his employment prospects in the future, especially considering the very public stigma of this case and a felony conviction that will plague his entire future.  In addition to the loss of prospective future employment, Mr. Grimm has agreed to pay restitution in this case, which will cause him to incur substantial debt, which will only compound the overwhelming financial debt Mr. Grimm already has incurred as a consequence of this proceeding.  These debts are financially crushing to Mr. Grimm, who has been a civil servant for most of his adult life, is still paying close to $50,000 in law school loans among his many other bills, and has been substantially impeded in obtaining gainful employment over the past seven months while awaiting sentencing.

Also, not to be overlooked, Mr. Grimm's offense has brought him considerable public humiliation and anguish, a severe punishment in itself. As this Court is aware, this case has been closely followed by the national media: Mr. Grimm's guilty plea and subsequent resignation from Congress was headline national news and has placed him under heavy media scrutiny. *See, e.g.*, William K. Rashbaum, *Rep. Michael Grimm Is Said to Agree to Tax Fraud Guilty Plea*, NEW YORK TIMES, Dec. 22, 2014, at A21; Alex Moe, *New York Rep. Michael Grimm to Resign after Guilty Plea*, NBC NEWS website, Dec. 30, 2014. The public humiliation of his conviction follows him everywhere and will mar him for the rest of his life.

In these circumstances, given all that he has already suffered and lost in connection with his tax offense, a non-custodial sentence comports with Section § 3553(a)'s mandate that the sentence be "sufficient, but not greater than necessary," to comply with the purposes of sentencing. *See* § 3553. Facing similar situations, where a defendant has suffered similar pre-sentencing consequences and punishment, courts have granted downward variances to sentences of probation. For example, in *United States v. Warner,* the defendant, a prominent CEO convicted of tax evasion—who caused a tax loss of over US $5 million—was facing a Guidelines range of 46-57 months. *See* 2/3/14 Tr. at 3:18-22, Case No. 13-cr-731 (N.D.Ill.) (DE 33). The court in *Warner* varied downward to a sentence of probation with 500 hours of community service in part because the defendant had already suffered notable loss and humiliation from the case. The Court stated:

> The hard question in this case is whether or not, given all of the relevant circumstances of the crimes and of the defendant, himself, some period of incarceration should be imposed. One of the considerations has to do with deterrence. It is obvious that specific deterrence is not necessary here. Mr. Warner has satisfied his civil legal obligations fully and there is no question of him violating the tax laws in the future given the highly-publicized nature of the proceeding. As for general deterrence of others in committing like crimes, some of that has already been established. This has been a highly-publicized prosecution. And the public humiliation and reproachment Mr. Warner has experienced is manifest. Only he

44

knows the private torment he has suffered by the public condemnation directed at him.

*See id*. at 50:2-16.  The *Warner* sentencing is but one of several such examples.  *See, e.g., United States v. Schuster*, 2002 WL 31098493, at *1 No. 01 Cr. 67 (S.D.N.Y. Sept. 19, 2002) (sentence of probation where defendant had been severely punished in part due to his disbarment as attorney).

### D.        The Need to Provide Restitution

The need to provide for restitution under § 3553(a)(7) also supports a probationary sentence.  Pursuant to his plea agreement, Mr. Grimm has agreed to pay restitution and to waive any appeal of a restitution order of less than US $200,000.  A sentence of probation, as opposed to a term of incarceration, will allow him to immediately seek and hopefully obtain some form of employment and use that income to satisfy his restitution obligation.  The ability of a defendant to work and satisfy a restitution obligation supports a downward variance to probation.

For example, in *United States v. Cole*, a defendant convicted of mail and wire fraud in the theft of US $33 million from Best Buy and tax evasion and tax fraud of over US $3 million, facing a Guidelines range of 135-168 months, received a downward variance to a sentence of probation.  *See* 765 F.3d 884, 886 (8th Cir. 2014).  The Eighth Circuit affirmed this massive variance, finding that the sentencing decision was procedurally and substantively reasonable because the district court had noted, among other things, that that "the probationary sentence would allow [the defendant] to work and earn money to make restitution to the victims of the fraud."  *See id*.  Also, in *United States v. Shockler*, Judge Weinstein awarded a defendant convicted of tax fraud who caused a tax loss of almost US $600,000 a downward variance to a sentence of probation in part because "[f]rom the taxpayer's point of view, it is better for this defendant to continue to pay restitution."  *See* No. 12-cr-415, 2013 WL 4851695, at *2 (E.D.N.Y. Sept. 10, 2013).

Accordingly, this factor too supports a non-custodial sentence.

### E.     The Need to Avoid Unwarranted Sentencing Disparity

Finally, and very importantly, to avoid a substantial sentencing disparity, the Court should grant a downward variance to a non-custodial sentence.  *See* § 3553(a)(6).  Defendants with backgrounds similar to or less upstanding than Mr. Grimm's, who were convicted of violating § 7206 or other tax-related offenses, and who in some cases caused substantially greater tax loss, commonly receive sentences of probation.  For example, examining local proceedings, we have identified numerous cases in the Eastern and Southern Districts of New York where defendants convicted of violating 26 U.S.C. § 7206(2) and other similar offenses received downward variances to non-custodial sentences.

In *United States v. Shockler*, the defendant, Dmitry Shockler, aided in the filing of false corporate tax returns by underreporting the gross receipts for six health clinics.  *See* 2013 WL 4851695, at *1.  Mr. Shockler, who was 41 years old, cashed health insurance checks payable to the clinics, but did not report the cashed checks as income to the accountant who prepared returns for the clinics.  *See id.*  The accountant then unknowingly underreported the total gross receipts.  Mr. Shockler pled guilty to six counts of violating § 7206(2); the tax loss to the United States was $592,704.05 (more than three times the amount of tax loss in Mr. Grimm's case); and Mr. Shockler's Guidelines range was 30-36 months.  *See id.*  At sentencing, Judge Weinstein noted that Mr. Shockler was a very hard working individual who worked 12-hour shifts driving a taxi for several years, and who supported and cared for his mother, who had breast cancer, by "taking her to doctor's appointments, making phone calls, handling bills, and dealing with emergencies." *See id.* at 2.  He also noted that Mr. Shockler "volunteered to help residents affected by [Hurricane] Sandy, demonstrating his commitment and close ties to the community."  *See id.*

On these facts, Judge Weinstein varied downward and sentenced Mr. Shockler to two years of probation on all six counts.  *See id.*  He reasoned that if Mr. Shockler was incarcerated, "[t]he people who will suffer are his wife, children, and mother. . . .  From the taxpayer's point of view, it is better for this defendant to continue to pay restitution and to support his family than to have the taxpayer pay the substantial cost of approximately $30,000 per year for incarceration, and welfare benefits to those he now supports."  *See id.* at 3.

In *United States v. Frank*, the defendant was convicted of one count of violating of § 7206(2) for assisting in the preparation and filing of a false income tax return on behalf of a corporation.  *See* No. 11-cr-820 (E.D.N.Y) (DE 3, 13).  The tax loss caused by the defendant was US $264,664, his total offense level was 17, and his Guidelines range was 24-30 months.  *See* Def.'s Sentencing Mem., *id.* (DE 11).  Judge Wexler granted a downward variance to a sentence of three years' probation.  *See id.* (DE 13).

In *United States v. Sime*, the defendant, who operated a tax preparation business whereby he prepared thousands of returns, was convicted of one count of violating § 7206(2) and responsible for a tax loss greater than US $80,000.  *See* No. 11-cr-295 (E.D.N.Y.) (DE 1, 59, 62).  In addition, the defendant "absented himself from the jurisdiction" during the pendency of the case.  *See* Def.'s Sentencing Mem.*, id.* (DE 24 at 2).  Nonetheless, Judge Feuerstein still granted a downward variance and entered a sentence of five years' probation.  *See id.* (DE 62).

In *United States v. Park*, the defendant, who had previously been convicted of mail fraud in connection with a Ponzi scheme, was, similar to this case, convicted of one count of violating § 7206(1) for under-reporting the gross receipts of a dry cleaning business he owned and using those receipts to pay employees "off the book" wages, causing a tax loss of US $133,601.  *See* No. 12 Cr. 344 (E.D.N.Y.) (DE 3, 20).  Mr. Park's scheme also included providing false information to

47

his company's accountant regarding the company's gross receipts. *See id*. (DE 20 at 2). Despite Mr. Park's criminal history, Judge Block granted a downward variance and sentenced Mr. Park to three years' probation. *See id*. (DE 21).

In *United States v. Cinquegrani*, the defendant, who was an attorney at the law firm Arnold & Porter LLP and had previously worked as an attorney for the IRS, was convicted of multiple tax violations, including one count of violating § 7206(2). *See* No. 8 Cr. 848 (S.D.N.Y.) (DE 15). Mr. Cinquegrani, along with certain Ernst & Young employees, engaged in a scheme to develop tax shelters that helped wealthy taxpayers cheat on their taxes. *See id*. (DE 2). Mr. Cinquegrani also lied under oath to the IRS when asked about his involvement in the scheme and tax shelter. *See US Judge Sentences Ex-Tax Lawyer to Probation*, Reuters, March 30, 2010. Judge Stein sentenced Mr. Cinquegrani to three years' probation. *See id*. (DE 2).

In *United States v. Halbreich*, the defendant, who operated a tax preparation business, "routinely prepared false income tax returns" for his clients, causing a tax loss of US $104,978. *See* Government's Sentencing Mem., No. 14-cr-256 (E.D.N.Y.) (DE 15) at 1-2. Convicted of one count of violating § 7206(2), the defendant faced a Guidelines range of 18-24 months. *See id*. at 2. Judge Brodie varied downward to a sentence of two years' probation. *See id*. (DE 18).

In *United States v. McCormack*, the defendant, who was engaged in a tax preparation business whereby he prepared fraudulent tax returns, was convicted of one count of violating § 7206(2). *See* No. 13-cr-597 (E.D.N.Y.) (DE 30). The defendant was facing a Guidelines range of 18-24 months (*see id*. (DE 25 at 11:1-7)), and agreed to pay US $141,029 in restitution. *See id*. (DE 30). At sentencing, Judge Hurley varied downward and imposed a sentence of 5 years' probation. *See id*.

48

In *United States v. Quinn*, the defendant was the sole owner of a clearinghouse business offering its members the opportunity to barter goods and services with one another.  *See* No. 10-cr-327 (E.D.N.Y.) (DE 3).  In connection with his business, the defendant was convicted of fourteen counts of § 7206(2) for failing to file Tax Form 1099s for the members of the clearinghouse, causing a tax loss of over US $100,000.  *See id*. (DE 13).  Judge Seybert varied downward imposing a sentence of three years' probation. *See id*.

In *United States v. Gonzalez*, the defendant, who operated a tax preparation business, was convicted on one count of violating § 7206(2).  *See* No. 7-cr-569 (E.D.N.Y.) (DE 36).  He was ordered to pay restitution in the amount of US $128,681, and sentenced to three years' probation, with a six month term of home confinement, by Judge Spatt.  *See id*.

In *United States v. Collymore*, the defendant was convicted of three counts of violating § 7206(1) for providing false income and expense figures to the tax preparer for his wife's medical practice, resulting in a tax loss of US $369,415 (more than double the amount of tax loss in the instant case).  *See* Government's Sentencing Mem., No. 13-cr-504 (E.D.N.Y.) (DE 12).  Judge Wexler granted a downward variance to a sentence of six months' imprisonment.  *See id*. (DE 14).

In *United States v. Ramchandani*, the defendant was convicted of one count of violating § 7206(1) and for failing to disclose a foreign account.  *See* No. 13-cr-324 (E.D.N.Y.) (DE 12).  The defendant paid over US $700,000 in restitution, over US $1.6 million in penalties to IRS, and over US $3.6 million to New York tax authorities for delinquent sales taxes and income taxes.  *See* Def.'s Sentencing Mem., *id*. (DE 9) at 2.  He was sentenced to a year and a day of imprisonment. *See id*. (DE 12).

In *United States v. Calcagno*, the defendant, an owner of a construction company, was convicted of one count of violating § 7206(1) for filing false tax returns on behalf of his company.

*See* No. 5-cr-298 (E.D.N.Y.) (DE 37, 57).   The defendant caused a tax loss of between US $330,000 and $525,000 (more than twice the tax loss in this case).   *See* Def.'s Sentencing Mem. (DE 52).   At sentencing, Judge Dearie ordered the defendant to pay over US $400,000 in restitution, but granted a downward variance to three years' probation.   *See id.* (DE 57).

In *United States v. Burton*, the defendant had a tax preparation business through which she prepared falsified tax returns and submitted and collected tax returns on behalf of individuals without their knowledge.   *See* Gov. Sentencing Mem., No. 11-cr-41 (E.D.N.Y.) (DE 29) at 1-2. The defendant was convicted of one count of violating § 7206(1), and was responsible for a tax loss exceeding US $200,000.   *See* (DE 29 and 69).   Facing a Guidelines range of 24-30 months, the defendant received a downward variance by Judge Bagley Amon to a sentence of five years' probation, with six months of home confinement.   *See id.* (DE 69).

In *United States v. Shin*, the defendant was the sole owner of a construction business that knowingly omitted over US $5.5 million in gross receipts over three years, resulting in a tax loss of over US $1.9 million (more than ten times the amount of tax loss in this case).   *See* No. 12-cr-182 (E.D.N.Y.) (DE 2).   The defendant was convicted of one count of violating § 7206(1) and was ordered to pay approximately US $1.9 million in restitution.   Judge Garaufis varied and sentenced her to five years' probation.   *See id.* (DE 8).

In *United States v. Cishooga*, the defendant under-reported over US $960,000 in gross receipts relating to his construction company through a check-cashing scheme, and continued his conduct after being questioned about it by IRS agents.   *See* Gov.'s Sentencing Mem., No. 14-cr-217(E.D.N.Y.) (DE 9) at 1-2.   He was convicted of one count of violating § 7206(1), and, with a tax loss of over US $319,000, was facing a Guidelines range of 18-24 months.   *See id.*   Judge

Vitaliano granted a downward variance and imposed a sentence of five years' probation, with 250 hours of required community service. *See id.* (DE 11).

In *United States v. Singh*, the defendant was convicted of one count of violating § 7206(1) for under-reporting over US $4 million in gross receipts received by his construction business. *See* Gov.'s Sentencing Mem., No 13-cr-408 (E.D.N.Y.) (DE 24); *see also* (DE 1). The defendant pled guilty to one count of violating § 7206(1), and caused a tax loss of over US $821,000. *See* Statement of Reasons, *id.* (DE 31) at 2; *see also* (DE 24). Judge Weinstein varied downward to a sentence of three years' probation, and ordered him to pay US $821,000 in restitution. *See id.* (DE 31). Explaining his reasoning, Judge Weinstein wrote:

> General deterrence is satisfied with the sentence imposed. The sentence will send a clear message that any involvement in making and subscribing a false tax return will result in a substantial amount of restitution and probation. Specific deterrence is achieved through the impact of this conviction on the defendant's employability. It is unlikely that he will engage in further criminal activity in light of his embarrassment to the community. His behavior is abhorrent but is not in accord with his background or the values of his community.

*See id.* (DE 31) at 4.

In *United States v. Mattarella*, the defendant was convicted of one count of violating 26 § 7201 and one count of § 7206(1). *See* No. 98 Cr. 309 (E.D.N.Y.) (DE 19). The defendant owed, and was ordered to pay to the IRS, over US $400,000. *See id.* He received a sentence of five years' probation, with a six month term of home detention. *See id.*

In *United States v. Torres*, Judge Johnson, Jr. varied to a sentence of 5 years' probation, where the defendant, convicted of one count of violating § 7206(2) and three counts of violating § 7206(1), had a Guidelines range of 18-24 months. *See* No. 4-cr-352 (E.D.N.Y.) (DE 49).

In *United States v. Kwong*, the defendant was convicted of one count of violating § 7206(2) for filing a false income tax return. *See* No. 08-cr-547, 2009 WL 1617941, at *1 (E.D.N.Y. June 2, 2009). He received a sentence of three years' probation. *See id*. at 2.

These are just some of the pertinent sentences for the Court to consider. Enclosed as Exhibit C to this memorandum is a list of over 180 cases involving convictions of § 7206 where defendants in the Eastern and Southern District of New York received sentences of probation. The prevalence of sentences in that range is consistent with sentencing data from the Second Circuit: in 2014, over 60% of the sentences handed down by district courts in the Second Circuit were below the Guidelines range. *See* U.S. SENTENCING COMMISSION, *2014 Sourcebook,* Table 26. More specifically, in the Eastern District of New York, of the over 900 defendants sentenced in 2014, more than 70% received downward departures or variances from the Guidelines range. *See id*., Appendix B.

There also are numerous cases outside of the Second Circuit where defendants convicted of more severe offense conduct, causing substantially greater tax loss, received non-custodial sentences. We have already discussed several such cases. In *Warner*, the defendant caused a tax loss of US $5.5 million but received probation. *See supra* 34, 44. The defendant in *Olenicoff* had US $52 million in civil tax liability and was also sentenced to probation. *See supra* 34. And in *Tomko*, the defendant engaged in "a sophisticated plan to evade taxation and compelled multiple individuals to aid him in the scheme," which "spanned several years" and "involved the planning, coordination, and coercion of numerous subcontractors, required a complicated system of concealment through fraudulent billing, and resulted in a stipulated tax loss of over $225,000." *See* 562 F.3d at 586. Yet, he received a sentence of probation, which was affirmed. *See id*. at 561.

There are other notable examples of probation sentences.  In *United States v. Stoerr*, the defendant engaged in an illegal bid rigging and kickback scheme in connection with his employment at Sevenson Environmental Services, Inc, and was convicted of several charges, including conspiracy to defraud the United States under 18 U.S.C. § 371 and violation of § 7206(2). *See* 695 F.3d 271, 273 (3d Cir. 2012).  The defendant was ordered to pay restitution of US $391,228 and was sentenced to a five-year period of probation.  *See id*. at 273.

In *United States v. Aaron*, the defendant, a heavy gambler, filed with casinos over four years at least 965 separate forms with incorrect Social Security information to avoid taxes.  *See* 590 F. 3d 405, 407 (5th Cir. 2009).  After being convicted *at trial* of seventeen counts of violating § 7206(1), he was sentenced to 180 days of home confinement and 2 years' probation, and fined US $ 170,000.  *See id.*

In *United States v. Carbajal-Vega*, the defendant, who operated a tax preparation service, prepared more than 36 false federal income tax returns claiming fraudulent refunds totaling US $59,363.  *See* No. 4-cr-349 (N.D.Ill) (DE 1).  She pled guilty to one count of § 7206(2) and received a sentence of 5 years' probation.  *See id*. (DE 39).

In *United States v. Roselli*, the defendant, who provided tax preparation services, prepared over 140 false returns, causing over US $100,000 in tax loss.  *See* 366 F.3d 58, 60 (1st Cir. 2004). The court awarded a pre-*Booker* departure to probation "based on the harm that his incarceration would cause to his family," given that two of his children had cystic fibrosis and because his wife suffered from several illnesses.  *See id*. at 62-63.  The court also noted that various letters were submitted regarding "the inability of other friends and relatives to adequately replace the services and care that Roselli provides to both his wife and children."  *See id*. at 63.

In sum, while certainly not exhaustive, we have identified a significant amount of cases that are squarely pertinent to this Court's sentencing decision here. We ask the Court to consider those cases and punishments when fashioning a reasonable and fair sentence for Michael Grimm.[7]

## V.    CONCLUSION

Mr. Grimm's exceptional personal background and service to this country; the role he played in and aberrational nature of his offense; the fact that defendants with similar or worse backgrounds, having committed the same offense with similar or greater tax losses, commonly receive sentences of probation; the extent to which Mr. Grimm has already been severely punished for his offense; his role as a caretaker for his mother and sister—all of these factors independently, in and of themselves, warrant and support a downward variance by the Court. But considering all of these factors in their totality and in the aggregate, there is but one unassailable conclusion here: that Michael Grimm should receive a non-custodial sentence, and nothing more.

Mr. Grimm is extremely remorseful over his conduct, and has fully accepted responsibility for it. He already has suffered tremendously as a result of his conviction, having resigned from his public office as a U.S. Congressman, facing disbarment and an uncertain future, being subject to widespread public reproach, forfeiting a Congressional pension, finding himself in financial ruin, and struggling for the past seven months to barely make ends meet while awaiting sentencing.

---

[7]    In fashioning a sentence that is proportionate and fair under § 3553(a)(6), the Court should also take into consideration that Mr. Grimm's offense is usually addressed through civil fines or penalties. It is well-known that businesses in the food and service industry often under-report cash receipts or pay their employees cash wages. *See supra* 34-35. The Government, however, rarely prosecutes these cases; at most, civil regulatory authorities will bring civil proceedings seeking civil money penalties. *See id.* Thus, a sentence of probation for Mr. Grimm is greater punishment than is typically imposed on individuals undertaking similar conduct. *See United States v. Suarez-Reyes*, No. 8:12CR67, 2012 WL 6597814, at *7 (D. Neb. Dec. 18, 2012) (granting downward variance for defendant convicted of check kiting in "recognition of the fact that many similar offenders escape prosecution altogether, or are subject only to civil penalties.").

Under these circumstances, nothing more severe than a sentence of probation is "sufficient, but not greater than necessary," to accomplish the aims of sentencing regarding Mr. Grimm.

For the foregoing reasons, and any others that may appear to the Court or that may develop at sentencing, Mr. Grimm respectfully requests that this Court sentence him outside the Guidelines with a variance to probation.

Dated: June 19, 2015

Respectfully submitted,

/s/  Daniel Lawrence Rashbaum

Daniel Lawrence Rashbaum (DR-4037)
drashbaum@mnrlawfirm.com

Jeffrey A. Neiman
Florida Bar No. 54469
jneiman@mnrlawfirm.com
*Pro Hac Vice Admitted*

MARCUS NEIMAN & RASHBAUM LLP
2 S. Biscayne Blvd., Suite 1750
Miami, Fl. 33131
Tel: 305-400-4260
Fax: 866-780-8355

Stuart Kaplan
Joseph Sconzo
KAPLAN SCONZO & PARKER, P. A.
3399 PGA Boulevard, Suite 180
Palm Beach Gardens, Florida 33410
(561) 296-7900

*Counsel for Michael Grimm*