

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DAS:JDG/NR
F. #2014R00763

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 30, 2015

By ECF

The Honorable Pamela K. Chen
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Michael Grimm
               Criminal Docket No. 14-248 (PKC)

Dear Judge Chen:

      The government respectfully submits this letter in response to the defendant Michael Grimm's sentencing memorandum filed on June 19, 2015 (Dkt. No. 95 ("Def. Mem.")). The defendant is scheduled to be sentenced on July 17, 2015 at 10:00 a.m. For the reasons set forth below and in the government's June 19, 2015 letter to the Court (Dkt. No. 94 ("Gov't Ltr.")), the government respectfully submits that the Court should sentence the defendant to a term of incarceration within the advisory Sentencing Guidelines (the "Guidelines") range of 24 to 30 months.

I.    A Custodial Sentence Would Not Result in an Unwarranted Sentencing Disparity

      Grimm argues that the Court should impose a non-custodial sentence to avoid a "substantial sentencing disparity," pointing to a number of instances in which courts in the Eastern and Southern Districts of New York (and elsewhere) have imposed sentences on defendants convicted of tax crimes below the advisory range of incarceration called for by the Guidelines. (Def. Mem. at 46-53). The defendant states that defendants convicted of similar, or in some instances, more serious tax crimes, "with backgrounds similar to or less upstanding than [his own]," received sentences of probation. (Id. at 46). In light of the cases he cites, the defendant argues that he should receive a non-incarceratory sentence, going so far as to claim that even a probationary sentence in his case would be "greater punishment than is typically imposed on individuals undertaking similar conduct," since offenses such as his are "usually addressed through civil fines or penalties." (Id. 54 n.7).

The Honorable Pamela K. Chen
June 30, 2015
Page 2

As an initial matter, the defendant ignores the fact that part of the rationale for enacting of the criminal tax provisions of the Guidelines was "to reduce disparity in sentencing for tax offenses." U.S.S.G. § 2T1.1, cmt. background (2014). "[E]ven though the Guidelines are advisory rather than mandatory, they are . . . the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." Gall v. United States, 552 U.S. 38. 46 (2007). "[D]eterring others from violating the tax laws is a primary consideration" underlying the Guidelines applicable in criminal tax cases such as this one. U.S.S.G. § 2T1.1, introductory cmt. (2014).

Accordingly, the Guidelines applicable here, which advise a term of imprisonment, would not create an "unwarranted sentencing disparity." To the contrary, a custodial sentence would be consistent with recent sentences in cases throughout the country where courts have imposed terms of imprisonment on individuals convicted of tax fraud. Attached as Exhibit 1 to this letter is a chart of recent cases where courts in this District and elsewhere have imposed custodial sentences in criminal tax cases. The defendant's suggestion that the imposition of such a sentence in this case would be in some way unfair, unreasonable or otherwise disparate from the sentencing decisions of other courts is therefore misplaced.

In urging that the Court impose a Guidelines sentence here, the government does not argue that incarceration is an appropriate sentence in every criminal tax prosecution.[1] By definition, the Court's consideration of the advisory Guidelines and the factors set forth in 18 U.S.C. § 3553 requires a highly individualized assessment of the defendant and the crimes he committed. For the reasons set forth in the government's initial sentencing submission, and as set forth further below, a consideration of all the relevant factors makes plain that an incarceratory sentence is warranted.

---

[1] Closer scrutiny of the cases cited by the defendant makes clear why attempting to draw direct parallels between his criminal conduct and that other defendants is of limited value. For example, in United v. Sime, No. 11-CR-298 (SJF) (E.D.N.Y. 2011) (see Def. Mem. at 47), the defendant was an immigrant taxi driver with an 8th grade education who had taken a one-day tax preparer course. The defendant's outstanding restitution at the time of sentencing was less than $15,000. Here, the defendant was an FBI special agent and a member of two state bars when he committed his crimes, and has made no effort to date to filed amended tax returns or pay any restitution. Similarly, in United States v. Cinquegrani, No. 08 Cr 849 (SHS) (S.D.N.Y. 2008) (see Def. Mem. at 48), the court cited the defendant's extensive cooperation with the government in imposing a non-incarceratory sentence, circumstances which are unlike the facts in this case. (See "U.S. judge sentences ex-tax lawyer to probation," Reuters, Mar. 30, 2010, available at http://www.reuters.com/article/2010/03/30/taxes-lawyer-sentencing-idUSN3014344520100330 (last visited June 30, 2015)).

The Honorable Pamela K. Chen
June 30, 2015
Page 3

II.   The Defendant Continues to Demonstrate a Lack of Remorse

Grimm claims that he "is tremendously remorseful over his offense." (Def. Mem. at 3). Yet in his sentencing submission, the defendant embraces a common "non-apology" apology formula, in which he admits what he can no longer credibly deny and shifts the blame for his conduct to others.

A.   The Defendant's Mischaracterization of His Role in the Offense

With respect to his role in the offense, the defendant claims that he was, in essence, an agent of other bad actors and that, with respect to Healthalicious' operation, he was carrying out a fraudulent blueprint devised by his business partner, Bennett Orfaly. (Def. Mem. at 33 ("[I]t is clear that [the defendant] did not devise and was not the driving force behind the payroll and accounting practices that form the offense conduct.")). The defendant goes further, stating that it was "Orfaly who had extensive experience in the restaurant industry" and that the defendant "did not initiate the scheme to commit these violations." (Id.).

The defendant's argument is absurd. The notion that the defendant, a motivated and highly educated attorney and former FBI special agent, entered into a partnership with Orfaly without doing basic background research strains credulity.[2] In addition, the Healthalicious fraud did not involve a complex accounting system that required expertise beyond the defendant's abilities or experience. The defendant could have brought the fraud to a halt by taking the following two decidedly uncomplicated steps: truthfully reporting all of his workers and all of their hours to Healthalicious' payroll companies; and truthfully reporting all of the restaurant's sales to his accountant. Having previously investigated white collar crime as an FBI agent, the defendant was ideally suited to identify a criminal business model and reject it. Instead, he embraced the fraud and made it his own. Grimm's attempts to suggest otherwise are disingenuous and call into question whether he has truly come to terms with his criminal conduct.[3]

---

[2]   Similarly, the defendant cannot plausibly claim that he was unaware that Orfaly and Manuel Perez were sued for engaging in illegal business practices at Orfaly's restaurants. In January 2007, Orfaly, Perez and others were sued by 19 employees for, among other things, unpaid wages that had been withheld in violation of the Fair Labor Standards Act, a fact noted by the defendant in his sentencing memorandum. (See Def. Mem. at 26).

[3]   The defendant acknowledged his central role in managing the restaurant in the February 6, 2010 email detailed in the government's initial sentencing letter. In that email, the defendant confirms that while his partner had experience in running restaurants, "[n]othing was getting done to [his] standards and "finally [he] took over everything." Indeed, it was the defendant who managed the day-to-day affairs of Healthalicious in 2007,

The Honorable Pamela K. Chen
June 30, 2015
Page 4

      B.      The Defendant's Unwillingness to Acknowledge
             the Seriousness of His Criminal Conduct

Grimm's attempts to minimize his criminal conduct in connection with his sentencing parallel his public comments before and after he was charged in this case, in which he misled and deflected blame, relenting only when there was no other option.

For example, the defendant was asked questions by the press relating to his business practices and associates in February 2012. He offered the following response:

> Like many small-business owners, I have experienced successes as well as setbacks. But I have tried to face adversity in the same way that I have met every challenge in my life: ethically and lawfully. I have relied as a businessman on the same principles of honesty that have guided my service as a Marine, an F.B.I. special agent and as a United States congressman. This attack is politically motivated, as my record as an effective congressman, fighting for Staten Island and Brooklyn, cannot be denied.

("Congressman's Business Ties Are at Odds with Upright Image," New York Times, February 15, 2012 (Exhibit 2)). The defendant's lie is plain: his conduct in business was neither lawful nor ethical. Further, equally troubling is that the defendant did not hesitate to invoke his history of public service to deflect questions about his criminal business practices and impugn the motives of those questioning his conduct.

In addition, in January 2014, , the defendant threatened a reporter after the reporter questioned Grimm about a federal investigation into his fundraising. (See "New York Rep. Michael Grimm threatens reporter after being asked about fundraising allegations," New York Daily News, Jan. 29, 2014 (Exhibit 3)). Questioned about his threats, the defendant did not initially apologize, but rather issued a statement blaming the reporter for "taking a disrespectful and cheap shot." (Id.). Only as public outcry grew did the defendant offer an acknowledgement that he was "wrong." (See "After 'I'll Break You in Half,' Grimm Apologizes," New York Times, Jan. 29, 2014 (Exhibit 4)).

The defendant followed a similar pattern after the indictment was unsealed in this case. On the day of his arrest and arraignment, he held a press conference outside of the

---

2008 and 2009; Orfaly and Perez did not communicate with Healthalicious' payroll companies or feed false tax information to the restaurant's accountant. (See Gov't Ltr. at 3-4; Exhibit A (Stipulation of Facts) ¶¶ 3-4). In short, the defendant was the driving force behind the Heathalicious fraud and was wholly responsible for his criminal conduct.

The Honorable Pamela K. Chen
June 30, 2015
Page 5

courthouse in which he characterized the government's investigation as a "political witch hunt," and announced his intent to "fight tooth and nail until I'm exonerated." ("Grimm slams federal government for 'political witch hunt,' promises to fight 'tooth and nail,'" Staten Island Advance, April 28, 2014 (Exhibit 5)). Even on the day of his guilty plea, the defendant sought to minimize his criminal conduct, stating that he was accepting full responsibility because "I'm the one that made a mistake as a small business owner." ("In Rep. Michael Grimm's own words: From defiance to downfall," Staten Island Advance, Dec. 30, 2014 (Exhibit 6)).[4]

Although the defendant casts himself as an individual with a life "nothing short of extraordinary in its commitment to service to this country and those in need" (Def. Mem. at 36), his habit of falsely denying and minimizing his criminal conduct and impugning anyone who questions him is indicative of an individual who has not come to terms with his own crimes. Accordingly, given his history and these characteristics, a sentence of incarceration within the Guidelines range is appropriate.

III.    The Defendant's Family Circumstances Do Not Support a Non-Custodial Sentence

Finally, the defendant argues that his role as a "sole caretaker" and "source of financial support" for his 68-year-old mother and 48-year-old sister support his argument for a non-custodial sentence. (Def. Mem. at 41-42). While the government does not dispute that the defendant's immediate family members face certain health issues, these issues do not constitute a basis to impose a non-custodial sentence in this case.

A departure from the Guidelines range applicable to a defendant is not permitted except in "extraordinary circumstances." United States v. Smith, 331 F.3d 292, 294 (2d Cir. 2003); see also U.S.S.G. § 5H1.6 (policy statement noting that "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted"). Here, the defendant's stated need to care for his mother and sister do not present such "extraordinary" circumstances to warrant such a variance. See United States v. Cutler, 520 F.3d 136 (2d Cir. 2008) (denying downward departure for family circumstances where defendant's spouse did not earn sufficient money to support his three children).

It is noteworthy that the defendant repeatedly sought re-election to the United States House of Representatives (most recently in November 2014), a highly demanding position that required him to spend substantial amounts of time away from Staten Island and away from his family. The defendant does not suggest that his mother and sister's

---

[4]    Despite the fact that, as a part of his plea agreement, the defendant stipulated that he lied under oath at the January 2013 deposition in the Civil Action while he was a member of Congress, the defendant falsely told the press immediately after his guilty plea that "everything we're talking about here happened before I was in Congress." (Id.)

The Honorable Pamela K. Chen
June 30, 2015
Page 6

circumstances have so deteriorated in the months since his guilty plea and resignation from the Congress such that he now needs to stay home with his family members on a constant basis.[5] Accordingly, the defendant's family circumstances, viewed in light of the factors in 18 U.S.C. § 3553, do not support a non-custodial sentence.

IV.     Conclusion

For the reasons above and for the reasons set forth in the government's June 19, 2015 letter, the government respectfully submits that the Court should sentence Michael Grimm to a term of incarceration within the applicable advisory Sentencing Guidelines range of 24 to 30 months.

                                               Respectfully submitted,

                                               KELLY T. CURRIE
                                               Acting United States Attorney

                              By:    /s/_____
                                  James D. Gatta
                                  Nathan Reilly
                                  Assistant U.S. Attorneys

cc:     Defense Counsel (by ECF)
       Clerk of the Court (PKC) (by ECF)
       Patricia Sullivan, Senior U.S. Probation Officer (by e-mail)

---

[5] It is also noteworthy that the defendant sought employment opportunities in recent months that would require international travel.  (See Dkt No. 85).